ROSENBAUM, Circuit Judge:
Dorothy may have said it best when she said, “There is no place like home.”[2] Though we are pretty sure that she was not talking about the Fourth Amendment, she may as well have been. Under the Fourth Amendment, the home is a sacrosanct place that enjoys special protection from government intrusion. The government may not enter a person’s home to effect a warrantless arrest without probable cause and either consent or exigent circumstances.
But here, that is exactly what happened. Defendant-Appellee.Deputy Kevin Peder-son claimed to be conducting a Terry stop[3] of Plaintiff-Appellant Elvan Moore while Moore was in his home. When Moore would not identify himself, Pederson concluded that he had probable cause to believe that Moore had violated the law by resisting an officer. In Pederson’s view, exigent circumstances also existed and Moore implicitly consented to Pederson’s arrest of him while Moore was still in his home. So Pederson reached into Moore’s home, handcuffed Moore, and arrested him. In fact, though, Pederson lacked probable cause, the circumstances were not exigent, and Moore did not implicitly consent to Pederson’s entry into Moore’s home to arrest Moore.
Nevertheless, at the time of the arrest, the law was not clearly established in this Circuit that a Terry stop could not be conducted inside the home in the absence of exigent circumstances. Nor was the law clearly established that a person in his own home who simply follows an officer’s instructions from outside the home to turn around and present hands for cuffing does not “surrender” and therefore consent to entry for the purposes of arrest. For these reasons, we hold today that, in the absence of exigent circumstances,[4] the government may not conduct the equivalent of a Terry stop inside a person’s home. We further hold that a person does not consent to entry into his home by an officer outside simply by following an officer’s instructions to turn around and be handcuffed, while the person remains inside his home.
But because the law on these points was not clearly established in this Circuit before our decision today, we affirm the district court’s entry of summary judgment *1040 on qualified-immunity grounds to Peder-son. We also affirm the district court’s dismissal of Moore’s state-law claim for intentional infliction of emotional distress.
I.
In the early morning hours of November 15, 2008, Defendant Seminole County Sheriffs Deputy Kevin Pederson was working road patrol. He received a dispatch from the Sheriffs Office in response to a call from someone at the Colonial Grand apartments. The complainant reported that a male and two females were outside, yelling at one another, though the complainant added that the dispute did “not sound violent.”
At approximately 4:45 a.m., Pederson arrived at the apartment complex. When Pederson got there, the caller met him and explained that a man and two women had been arguing in the parking lot and that one of the women had left in a white vehicle. According to the caller, verbal disputes involving these people were “an everyday occurrence.” The caller then directed Pederson to Plaintiff Elvan Moore’s apartment as the unit into which the couple retreated.
Based on this information, Pederson approached Moore’s residence to further investigate the situation. As he neared the door, he heard what he described sounded like an argument, though he could not make out any words. In addition, Peder-son stated that he heard music coming from the apartment.
Pederson knocked on Moore’s door. When Moore opened the door, he was wearing a towel wrapped at the waist, and two women were visible inside the apartment — one naked and one clothed. Though neither woman asked for assistance or otherwise indicated she was in distress, Pederson stated that he thought that one of the women “had a scowl on her face” and “appeared visibly upset, pissed off,” but he could not discern at whom she was mad. From Pederson’s “initial impression,” he thought “maybe this is a girlfriend that just walked in on a boyfriend who is with another woman.”
Pederson began interviewing Moore in order to investigate Moore’s involvement in the parking-lot disturbance. In addition, Pederson explained, he did not know whether “a domestic violence situation” existed, based on what he had seen.
In response to the questioning, Moore-expressed lack of knowledge that a parking-lot disturbance had occurred, and when Pederson requested that Moore provide his name and identification,' Moore declined. Moore also refused subsequent requests from Pederson to identify himself.
At some point during the conversation and after Moore’s multiple refusals to provide identification, Pederson took out his handcuffs and instructed Moore to turn around and put his hands behind his back. Moore did so. At the time, Moore was standing inside the doorway of his apartment.[5] So Pederson reached into Moore’s, residence, handcuffed Moore, and arrested him. Pederson then led Moore, who was still wearing a towel when he was handcuffed, from the doorway of his apartment to the patrol vehicle.
During the walk to the patrol vehicle, Moore’s towel fell off.[6] After placing *1041 Moore in the patrol vehicle, Pederson took Moore to the police station where he was booked and eventually provided a jump suit to wear. Moore was subsequently charged with violating Florida Criminal Statute 843.02: resisting officer — obstructing without violence. The charges against Moore were eventually dropped.
II.
Following these events, Moore filed an amended complaint asserting claims for, among other things, unlawful arrest in violation of 42 U.S.C. § 1983 (“ § 1983”) and intentional infliction of emotional distress (under Florida law).[7] According to the amended complaint, Moore claimed that he was unlawfully arrested without probable cause based only on his refusal of Peder-son’s request to provide biographical information for a report.
Pederson filed a motion for summary judgment on all claims, and Moore filed a cross-motion for summary judgment on his § 1983 claim. The district court granted summary judgment in favor of Pederson on all claims. We now affirm.
III.
We review de novo the district court’s disposition of a summary-judgment motion based on qualified immunity. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir.2002). Summary judgment should be entered when “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to the non-moving party. Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir.2008) (per curiam); Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir.2012).
IV.
The qualified-immunity defense balances “the need to hold public officials accounta *1042 ble when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). Qualified immunity exists “to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation.” Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003).
 In pursuit of that aim, qualified immunity protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate “clearly established federal statutory or constitutional rights of which a reasonable person would have known.” Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir.2010) (quotation marks, and brackets omitted). Under its strictures, the doctrine shields from liability “all but the plainly incompetent or one who is knowingly violating the federal law.” Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002). As a result, qualified immunity “liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery.” Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir.2003) (internal quotation marks omitted). This safeguard, however, does not extend to one who “knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].” Id. (internal quotation marks & alteration omitted).
Qualified immunity requires a public official to show first that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir.2013). We have said that the term “discretionary authority” “include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority.” Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir.1994) (internal quotation marks omitted). Here, there is no question that Pederson satisfied this requirement, as Pederson engaged in all of the challenged actions while conducting investigative and arrest functions as a deputy sheriff and while on duty.[8]
Because Pederson has established that he was acting within the scope of his discretionary authority, the burden shifts to Moore to demonstrate that qualified immunity is inappropriate. See id. Moore must show that, when viewed in the light most favorable to him, the facts demonstrate that Pederson violated Moore’s constitutional right and that that right was “clearly established .... in light of the specific context of the case, not as a broad general proposition^]” at the time of Ped-erson’s actions. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565. We may decide these issues in either order, but, to survive a qualified-immunity defense, Moore must satisfy both showings. Maddox, 727 F.3d at 1120-21 (citation omitted).
*1043 A.
We start by considering whether Peder-son transgressed any of Moore’s constitutional rights. We find that he did. In particular, Pederson violated Moore’s right to be free from unreasonable seizures.
1.
Stemming from the origins- of our nation, the home has always been viewed as a sacrosanct place with unique rules that apply to it. See Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (“The zealous and frequent repetition of the adage that a ‘man’s house is his castle,’ made it abundantly clear that both in England[ ] and in the Colonies ‘the freedom of one’s house’ was one of the most vital elements of English liberty”). Indeed, the Framers considered the hallowed stature of the home to be so important that they directed two amendments in the Bill of Rights at it, protecting the privacy of the home with both the Fourth Amendment and the Third Amendment.[9]
With respect to the Fourth Amendment, the Supreme Court has opined that the “physical entry of the home is the chief evil against which the wording of [that provision] is directed.” United States v. U.S. Dist. Ct. for E.D. Mich., S. Div., 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). Looking to the language of the Fourth Amendment, it is easy to understand the Supreme Court’s reasoning. The Fourth Amendment strictly commands, “The right of the people to be secure in their persons [and] houses ... against unreasonable ... seizures, shall not be violated.... ” U.S. Const. amend IV. Under it, “no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons ... to be seized.” Id.
As the Supreme Court has explained, the Fourth Amendment “draw[s] a firm line at the entrance to the house.” Payton, 445 U.S. at 590, 100 S.Ct. at 1382. As a result, “warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest and either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant.” Bashir v. Rockdale Cty., Ga., 445 F.3d 1323, 1328 (11th Cir.2006). But make no mistake: in the absence of these stringent circumstances, for the purpose of arresting a person without a warrant, “any physical invasion of the structure of the home, ‘by even a fraction of an inch,’ [is] too much....”[10] Kyllo v. United States, 533 U.S. 27, 37, 121 S.Ct. 2038, 2045, 150 L.Ed.2d 94 (2001) (citation omitted).
Applying these rules, in McClish v. Nugent, 483 F.3d 1231 (11th Cir.2007), we held that an officer who, without a warrant, or probable cause along with exigent circumstances or consent, “reached into [a] house, grabbed [the plaintiff], and forcibly pulled him out onto the porch” in order to *1044 arrest him, violated the plaintiffs Fourth Amendment rights.
2.
Moore’s case is not materially different. Like the officer in McClish, Ped-erson did not have a warrant, and he lacked probable cause, exigent circumstances, and consent. He nonetheless breached Moore’s home’s threshold for the purpose of arresting Moore when he handcuffed Moore, who was standing inside his apartment’s doorway at the time. As a result, Pederson violated Moore’s Fourth Amendment right to be free from unreasonable seizures.
While Pederson contends that he had probable cause to arrest Moore for his alleged violation of Fla. Stat. § 843.02, which makes it illegal to resist an officer without violence, serious problems doom Pederson’s argument. To begin with, Ped-erson’s position necessarily depends on the conclusion that Moore refused to provide his identification to Pederson during a lawful Terry stop, but Pederson did not conduct a lawful Terry stop.
In Terry v. Ohio, the Supreme Court held that an officer does not violate the Fourth Amendment by conducting a “brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.” Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000) (citing Terry, 392 U.S. at 30, 88 S.Ct. at 1868). A Terry stop is a type of seizure under the Fourth Amendment because it restrains the freedom of the detainee to walk away or otherwise remove. himself from the situation. Terry, 392 U.S. at 16, 88 S.Ct. at 1877. The standard of “reasonable suspicion” that is required to justify a Terry stop is significantly more lenient than that of “probable cause,” which is necessary to support a warrant. Id. at 123, 120 S.Ct. at 675-76.
Pederson asserts that, when he initially approached Moore’s door, he had reasonable, articulable suspicion of a breach of the peace, based on the complainant’s report about the parking-lot dispute and the music and argument emanating from inside Moore’s apartment. For purposes of our discussion, we will assume that he is correct.[11] Pederson bolsters his reasonable-suspicion argument by relying on his assessment of the situation after Moore opened the door — namely, that he had reasonable, articulable suspicion that a possi *1045 ble ongoing domestic dispute related to the parking-lot incident could have been occurring. These circumstances, Pederson suggests, independently allowed him to continue his Terry stop.
But significantly, the circumstances in this case did not satisfy the definition of “exigent circumstances” either before or after Pederson’s interaction with Moore. Before Pederson knocked on Moore’s door, all he knew was that a neighbor had complained of a non-violent argument in the parking lot where one of the participants had left the scene, and Pederson heard what he believed could have been arguing and music coming from inside the apartment. These facts are a .far cry from an “emergency situation[] involving endangerment to life” that we have previously described as constituting exigent circumstances. See, e.g., United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir.2002).
And after Moore opened the door for Pederson, nothing that Pederson reported observing established or even suggested that anyone’s life or health was at risk. At worst, Pederson saw a naked man, a naked woman, and a clothed woman with a scowl on her face. No one appeared injured in any way; Pederson did not report seeing any furniture or other items strewn about; and Pederson did not identify any behavior or conduct that suggested that any of the occupants of the residence contemplated violence in any way. Moreover, while the complainant reported hearing arguments from that apartment on other occasions, which he considered a nuisance, he specifically described the disputes as “verbal” and non-violent. This is not the stuff of which life- or limb-threatening emergencies that constitute “exigent circumstances” are made.
As a result, Pederson could not have lawfully executed a Terry stop in this case. Because Pederson did not have a warrant and he was not conducting a lawful Terry stop when Moore was inside his home, Moore was free to decide not to answer Pederson’s questions. Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) (“When the police knock on a door ... [and the] occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.”). Consequently, Moore’s refusal to answer Pederson’s requests for identification could not have served as the basis for a violation of Fla. Stat. § 843.02, resisting an officer without violence, and Pederson lacked probable cause to arrest Moore for this violation.
Not only were probable cause and exigent circumstances lacking, but Moore also did not consent to Pederson’s entry for the purpose of arresting him. To assert that Moore did consent, Pederson relies on dicta in McClish, 483 F.3d 1231, 1240-41 (11th Cir.2007). In McClish, .the defendant officers decided that they had probable cause to arrest McClish for aggravated stalking. Id. at 1234. Though they had no warrant and they conceded that they lacked exigent circumstances, the officers went to McClish’s home to arrest him. Id. at 1234-35. In response to the officers’ knock, McClish opened his front door. Id. at 1235. One of the officers immediately reached into McClish’s home, grabbed McClish, pulled him out of his home, and arrested him. Id. at 1235-36. We held that the officers violated McClish’s Fourth Amendment right to be free from unreasonable seizures when they entered McClish’s home for the purpose of arresting him without a warrant, exigent circumstances, or consent. Id. at 1248.
In the course of noting that the record contained no evidence that McClish had consented to entry for the purposes of *1046 arrest, we explained, “[W]e have held that ‘whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction entry into the home based upon inferred consent.’ ” Id. at 1241 (citations omitted). We then clarified, “This is not to say, of course, that a suspect may not surrender to the police— ‘there is nothing in Payton that prohibits a person from surrendering to police at his doorway.’ ” McClish, 483 F.3d at 1241 (emphasis added) (citing United States v. Berkowitz, 927 F.2d 1376 (7th Cir.1991)).
Pederson latches onto this language in McClish and our citation to Berkowitz to argue that Moore “surrendered” to Peder-son when Moore turned around and put his hands behind his back, so Pederson was free to enter Moore’s home to effect the arrest. We disagree.
This case does not involve any affirmative act evidencing free and voluntary consent to Pederson’s entry into the home. Instead, Moore simply followed the commands of an armed law-enforcement officer who was standing face to face with Moore and had just advised Moore that he was going to handcuff and arrest Mm. But Pederson cannot establish that Moore freely and voluntarily consented by “showing a mere submission to a claim of lawful authority.” See Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). A person should not have to risk the possible use of force against him in an officer’s mistaken effort to obtain the intended arrestee’s compliance with the officer’s commands. And we do not wish to contribute to the already-daunting level of danger that law enforcement must face by encouraging people to disobey what they may perceive as lawful police orders. We therefore hold that Moore did not consent to Pederson’s entry into Moore’s home for the purpose of arresting Moore when Moore turned around and presented his hands to Pederson in response to Ped-erson’s commands to Moore to do just that.
We have said that an officer may not enter the home for the purpose of effecting a warrantless arrest unless that officer has both probable cause and either exigent circumstances or consent. Bashir, 445 F.3d at 1328. So we cannot see how law enforcement could enter a home to detain a person on reasonable, articulable suspicion of a criminal violation (resisting an officer without violence) — a much lower standard than probable cause — when neither exigent circumstances nor consent exist. That just makes no sense to us. See United States v. Saari, 272 F.3d 804, 809 (6th Cir.2001) (“It would defy reason to hold ... that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest.”).
In the absence of probable cause and without a warrant, Pederson could not have lawfully entered Moore’s premises for the purpose of arresting him. Because Pederson reached into Moore’s home to arrest him, anyway, Pederson violated Moore’s constitutional right to be free from unreasonable seizure.
y.
Having determined that Pederson violated Moore’s Fourth Amendment right to be free from unreasonable seizure, we consider whether, as of November 15, 2008, when Pederson arrested Moore, the parameters of that right as it arose in this case were clearly established. We find that they were not.
The touchstone of qualified immunity is notice. Holmes, 321 F.3d at 1078. The violation of a constitutional right is clearly *1047 established if a reasonable official would understand that his conduct violates that right. See Coffin v. Brandan, 642 F.3d 999, 1013 (11th Cir.2011) (en banc).
Our Circuit uses two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right. Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir.2011). The first requires the court to examine whether “decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) [have] clearly established] the law.” McClish, 483 F.3d at 1237 (citation omitted). This method does not require “[e]xact factual identity with a previously decided case” but rather demands that “the unlawfulness of the conduct must be apparent from the pre-existing law.” Coffin, 642 F.3d at 1013 (citations omitted).
The second approach asks whether the officer’s “conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-spqcific case law” on point. Fils, 647 F.3d at 1291 (alteration in original) (citation and quotation marks omitted). Even in the absence of caselaw holding the specific conduct unlawful, a “general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.” Coffin, 642 F.3d at 1014-15; see Fils, 647 F.3d at 1291. But this principle, which offers a narrow exception to the general rule that only factually specific analogous caselaw can clearly establish a constitutional violation, is reserved for rare cases. Coffin, 642 F.3d at 1015.
A. The Initial Terry-like Stop
Moore does not point to a particular Supreme Court, valid Eleventh Circuit, or Florida Supreme Court case that he contends clearly established that Terry-like stops may not be conducted in the home. Instead, he asserts that it was clearly established that a Terry stop could not occur inside the home because all cases approving of Terry stops involve temporary detentions in public places, not in homes. In further support of his argument, Moore points to a vacated Eleventh Circuit case and cases outside this Circuit where courts have opined that a Terry stop cannot occur in- the home. We disagree that Moore has demonstrated that the law was clearly established in this case as of November 15,'2008, that an officer may not conduct a Terry-like stop in the home in the absence of exigent circumstances.
First, the mere dearth of binding case-law holding that a particular activity is constitutional, cannot, in and of itself, clearly establish that that activity is unconstitutional or otherwise impermissible. Indeed, that Moore discovered no valid, binding caselaw that holds that a Terry-kke stop can be conducted in a home does not somehow clearly establish the principle that a Terry-like stop cannot be executed in a home.
Nor does Moore find the necessary support in the cases he cites. Moore- relies on a vacated Eleventh Circuit case, two Ninth Circuit cases that were issued after No- , vember 15, 2008, and a Tenth Circuit case that was issued in May 2008. To state the obvious, United States v. Tobin, 890 F.2d 319, 327 (11th Cir.1989), vacated, 902 F.2d 821 (11th Cir.1990), the Eleventh Circuit case on which Moore relies, was vacated. That means it has no legal force, so it could not have clearly established the law.
*1048 While Moore acknowledges as much, he suggests that the Eleventh Circuit’s subsequent en bane opinion in U.S. v. Tobin, 923 F.2d 1506, 1511 (11th Cir.1991) (en banc) (“Tobin II”), clearly established that an in-home Terry-like stop violates the Fourth Amendment when it stated that “reasonable suspicion cannot justify the warrantless search of a house.” Not only does the quotation that Moore cites address warrantless searches, not Terry-like stops, but review of the entire quotation— “Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents’ approaching the house to question the occupants,” 923 F.2d at 1511 (emphasis added) (citation omitted) — does not “dictate[ ], that is, truly compel[ ], the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiff[’s] federal rights in the circumstances.” Evans v. Stephens, 407 F.3d 1272, 1282 (11th Cir.2005) (en bane) (citation and internal quotation marks omitted).
In fact, a panel of this Court, relying on the same quotation about “warrantless searchfes]” in Tobin II on which Moore hangs his hat, said only that “[w]e are skeptical that ‘reasonable suspicion’ is the correct standard for justifying the officers’ entry” into the home. Morris, 748 F.3d at 1323 n. 17. If, as recently as last year, a panel of this Court was, at worst, “skeptical” that Terry-like stops could occur in the home, we cannot say that the law on that point was “clearly established” for officers six-and-one-half years ago. For this reason, Moore’s argument must fail, regardless of the caselaw from other jurisdictions.[12] And we cannot conclude that in November 2008 the law was clearly established in this Circuit that a Terry-like stop cannot be conducted in the home, in the absence of exigent circumstances. As a result, the district court correctly found that Pederson was protected by qualified immunity with respect to the initial Terry-like stop.
B. The Arrest
We reach the same conclusion regarding the warrantless arrest. It is true that as of November 15, 2008, when the incident in this case occurred, the law was clearly established in this Circuit that an officer may not conduct a warrantless arrest without both probable cause and either exigent circumstances or consent. See Bashir, 445 F.3d at 1328. And here, Pederson had no warrant, and he similarly lacked exigent circumstances and consent.
But, as discussed above, none of the cases that stand for the principle that a warrantless arrest may not be conducted in the home without both probable cause *1049 and either exigent circumstances or consent involved a Terry stop.
When an officer lawfully conducts a Terry stop, Fla. Stat. § 843.02 authorizes the officer to arrest a person who refuses to provide identification in response to re-. quests. See M.M. v. State, 51 So.3d 614, 616 (Fla.Dist.Ct.App.2011). Neither exigent circumstances nor probable cause is necessary. So Pederson suggests that, had he been correct in thinking that he could execute a valid Terry stop in the home, he would not have needed either exigent circumstances or consent to effect the arrest of Moore, even though he had to reach into Moore’s home. Pederson further relies on the proposition that we must evaluate whether the violated constitutional right was clearly established “in light of the specific context of the case, not as a broad general proposition.” See Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
We need not determine whether Pederson’s theory on this particular issue is correct because, in any case, we cannot find that, at the time of the events in this matter, the law was clearly established with respect to the bounds of consent to enter the home for the purpose of effecting an arrest. We recognize, of course, the clearly established general proposition that consent is not freely and voluntarily given when a person merely acquiesces to a claim of lawful authority. See United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir.1993).
But “[ojbvious clarity cases” are “rare.” Coffin, 642 F.3d at 1015 (citations and quotation marks omitted). To rely on that “narrow exception,” we must find that the officer’s acts were “so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable ... officer that what the defendant officer was doing must be ‘unreasonable’ within the meaning of the Fourth Amendment.” Id. (citations and quotation marks omitted).
Here, we cannot do that. First, while the Dissent notes that McClish established “the [factually specific] rule that an officer may not infer consent to reach into a home to execute an arrest,” Dissent at 1060, it does not acknowledge that the very next sentence of McClish necessarily narrowly defined until today what “inferring] consent” meant in this Circuit by stating that “surrender” can permissibly communicate consent to entry for purposes of effecting an arrest. Significantly, none of the caselaw that the Dissent cites or that we have been able to find considers what constitutes “surrender” in the absence of overwhelming force, for purposes of establishing consent to enter the home and execute an arrest.[13] So, with respect to the issue of consent, none of the cases on which the Dissent relies&emdash;including *1050 MeClish — are factually similar to Moore’s case.[14]
Second, the universe of our easelaw on the meaning of “surrender” in the context of consent to an arrest in the home appears to be limited entirely to MeClish. As we have noted, MeClish specified that an officer may enter the home for the purposes of arresting a person if the person “surrender [s] to the police — ‘there is nothing in Payton that prohibits a person from surrendering to police at his doorway.’ ” McClish, 483 F.3d at 1241 (emphasis added). This statement appears in MeClish without further discussion than its citation to Berkowitz, 927 F.2d 1376. McClish, 483 F.3d at 1241. Nor can we find that the facts of MeClish, where the petitioner “did not surrender ... [or] have the opportunity to do so,” 483 F.3d at 1241 (emphasis added), otherwise provides any guidance as to what can or does constitute “surrender” for purposes of consent.[15]
As a result, a reasonable officer might either understand the term “surrender” to carry its common meaning, as limited by the facts of cases such as Edmondson, 791 F.2d 1512, see supra at n. 12, or a reasonable officer might consult Berkowitz for guidance on the meaning of the term. Either way, under MeClish, a reasonable officer would not be on clear notice before today that Moore’s actions did not constitute the type of “surrender” that can qualify as consent for the purpose of entering a home to effect an arrest.
With respect to the common or plain meaning of “surrender,” the dictionary defines the term as follows: “[t]he act of yielding to another’s power or control,” Surrender, Blaok’s Law DICTIONARY (10th ed.2014), or “[t]o relinquish possession or control of to another because of demand or compulsion,” Surrender, The AM. HeRitage DICTIONARY OP THE ENGLISH LANGUAGE (4th ed.2000). Based on these definitions, before today, a reasonable officer could have understood Moore’s actions in turning around and presenting his hands in response to the officer’s instructions as surrender, and consequently, as consent under MeClish.
This is so because, in conjunction with Moore’s actions, nothing in the record provides evidence that Moore ever said or otherwise communicated that he did not consent to entry for the purposes of executing the arrest. Nor does any evidence indicate that Pederson physically threat *1051 ened Moore or otherwise presented Moore with the type of overwhelming force that occurred in Edmondson in order to obtain Moore’s cooperation with Pederson’s instructions.
As for Berkowitz, that case, too, could be construed to support the notion that a person inside his home “surrenders” for arrest to an officer outside the home when he acquiesces in the officer’s directions— whatever those directions happen to be— instead of simply closing the door to his home. And, in fact, Pederson devoted three pages of his brief to arguing that, under Berkowitz, Pederson reasonably construed Moore’s actions in turning and offering his hands in response to Peder-son’s instructions, as consent in the form of surrender.
In Berkowitz, the court evaluated alternative factual scenarios. In the one relevant here, an officer knocked on the defendant arrestee’s door, and the defendant opened the door. 927 F.2d at 1380. The officer immediately advised the defendant that he was under arrest. Id. In explain-' ing what happened next, the court wrote that the defendant “did not resist or attempt to close the door; he simply asked if he could have his sports coat.” Id. (emphasis added). An officer then entered the home, retrieved the coat, and arrested the defendant. Id.; see also id. at 1386. The court concluded that the arrest, including the entry into the defendant’s home to effect the arrest, was “legal” because the defendant had “surrenderfed],” “acquiesced” in, and “submitted to” the officer’s' authority. Id. at 1386. In explaining its ruling, the court stated,
When the police assert from outside the home their authority to arrest a person, they have not breached the person’s privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police’s authority and stands waiting for the police to take him away can hardly complain when the police enter his home briefly to complete the arrest.
Id. at 1387.
In contrast to the Dissent’s contention that it was clearly established in this Circuit that “an arrestee does not ‘consent’ when he obeys a police officer’s command that he is under arrest,” Dissent at 49, we think that Berkowitz could be read to suggest just the opposite: that “acquiescence” in and “submission to” an officer’s authority instead of closing the door of one’s home in response to an officer’s command that one is under arrest, can constitute surrender, and therefore consent to entry into the home for purposes of effecting an arrest.
In Moore’s case, Moore did not close his door in response to Pederson’s announcement from outside the home that Moore was under arrest. Rather, Moore acquiesced in and submitted to Pederson’s instructions that he turn around and present his hands for cuffing. Based on Ber-kowitz, we cannot say that a reasonable officer plainly should have known that Moore’s conduct did not evidence “surrender.” [16]
*1052 To be clear, for the reasons we have already described, we strongly reject any suggestion that a person “surrenders” and therefore “consents” to arrest in his home simply because he recognizes the officer’s authority or “submit[s] to” or “acquiesced” in the arresting officer’s commands or because he does not close the door of his home in response to an officer’s announcement that he is under arrest. Today we clearly establish as the law of this Circuit that merely following an officer’s commands&emdash;-without any separate affirmative act or speech demonstrating voluntary and free consent&emdash;does not constitute “surrender” and therefore consent to an officer’s entry into the home to effect the arrest. Nor does failure to close the door.
But we have “emphasized that fair and clear notice to government officials is the cornerstone of qualified immunity.” Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir.2002) (quoting Marsh v. Butler Cty., 268 F.3d 1014, 1031 (11th Cir.2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added by Vinyard panel). And in light of McClish and Berkowitz, we cannot say that, as of November 15, 2008, Peder-son had “fair and clear notice” that a person does not “surrender” and therefore consent to entry of his home for purposes of effecting an arrest, by “acquiescing]” in or “submitting] to” the arresting officer’s announcement that he is under arrest and by turning around and presenting hands for cuffing in response to instructions to do just that (and not closing the door of his home instead). As a result, qualified immunity shields Pederson from liability for his wrongful entry into Moore’s home to arrest him.
Nor does the Dissent’s concern about considering Berkowitz allow us to disregard the case. The Dissent mentions Ber-kowitz only briefly. See Dissent at 1060 & 1060 n. 1. Notably, the few mentions of Berkowitz do not suggest in any way that our interpretation of Berkowitz’s discussion of “surrender” is not a reasonable one. Instead, the Dissent seems to advocate effectively ignoring Berkowitz simply because the Seventh Circuit issued it.
While we generally agree that Seventh Circuit law does not govern the question of qualified immunity in this Circuit, the problem here is that our easelaw&emdash; McClish&emdash;favorably cites Berkowitz for the proposition that surrender can constitute consent to entry of the home for purposes of arrest. At the same time, McClish does not elaborate any further on the meaning of “surrender” in the context of consent to enter a home to conduct an arrest.- Particularly in light of the broad common meaning of “surrender,” it would not have been unreasonable for an officer to have consulted Berkowitz for guidance on the meaning of “surrender.” Under these circumstances, we will not penalize an officer for acting in accordance with his not-unreasonable understanding of a case that we ourselves have relied upon.
Finally, we note that the question before the district court (and therefore before us) on Pederson’s motion for summary judgment based on qualified immunity was not, as the Dissent suggests, whether Moore, in fact, viewed himself as having consented to entry. See Dissent at 1060-62. The question instead was whether a reasonable officer in Pederson’s position could have understood Moore’s words (of lack thereof) and actions, as set forth in the light most favorable to Moore, to have evidenced consent on Moore’s part. See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (“[W]hether an official protected by qualified immunity may be held personally lia *1053 ble for an allegedly unlawful official action generally turns on the ‘objective legal reasonableness’ of the action[,] ... assessed in light of the legal rules that were ‘clearly established’ at the time it was taken.”). So. Moore’s legal argument in his brief that, as a matter of fact, he did not consent to entry, in and of itself, cannot create a material issue of fact regarding whether Pederson is entitled to qualified immunity on the grounds that a reasonable officer could have construed Moore’s uncontested words and actions as consent to entry.[17]
Because the law was not clearly established until today that Pederson lacked probable cause to arrest Moore since he could not conduct a Terry-like stop in the home absent exigent circumstances, and further, because the law was not clearly established until today that Moore’s actions in acquiescing to Pederson’s instructions did not amount to consent to enter the home, the district court properly granted Pederson qualified immunity.
VI.
Finally, we turn to the district court’s entry of summary judgment for Pederson on Moore’s claim for intentional infliction of emotional distress.
In Florida, to prove intentional infliction of emotional distress, a plaintiff must show that (1) the defendant’s conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. Gallogly v. Rodriguez, 970 So.2d 470, 471 (Fla.Dist.Ct.App.2007). Regarding the second prong, even tortious or criminal intent, or intent to inflict emotional distress, standing alone, is not enough. Metro. Life Ins. Co. v. McCarson, 467 So.2d 277, 279 (Fla.1985) (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law. Inst. 1965)). Nor is “conduct [that] has been characterized by ‘malice,’ or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.” Id. (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law. Inst. 1965)). Instead, Florida courts have found “ ‘[liability ... only where the conduct has been so outrageous in óharacter, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.’ ” Id. (quoting Restatement (Seoond) of Torts § 46 cmt. d (Am. Law. Inst. 1965)). Indeed, only those situations where “recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, ‘Outrageous!’” satisfy the standard required to establish a claim of intentional infliction of emotional distress. Id. (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law. Inst. 1965)). Nonetheless, in situations involving government *1054 authority, courts recognize that “[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position” and consequently “give greater weight to the fact that the defendants had actual or apparent authority over [the plaintiff] as police officers.” Gallogly, 970 So.2d at 472 (quotation marks omitted).
Moore argues that Pederson “forced” Moore to be naked and refused to allow Moore to put on clothing, and he alleges that both acts constituted extreme and outrageous conduct. Under Moore’s recollection of the facts, Pederson arrested Moore while Moore was wearing a towel wrapped around his waist. On the walk from Moore’s front door to the police car, Moore’s towel began to fall off, completely dropping by the end of the first five feet of the walk.[18] For the remaining fifteen feet, Moore was completely naked. When Moore asked two separate people to bring him clothes, Pederson responded by instructing them to stay where they were, or he would arrest them as well.
Upon arrival at the Sheriffs Office, Moore saw a woman approaching to process him. In response, Moore asked Ped-erson to please make arrangements for a man to process him since he was naked. Pederson immediately obliged, and a man processed Moore instead, bringing him a blue jumpsuit to put on.
We need not determine whether Pederson’s conduct was “outrageous.” Regardless of whether it was, we are compelled to affirm the district court’s grant of summary judgment on Moore’s claim for intentional infliction of emotional distress. Mo'ore was required to show that he suffered “severe” emotional distress stemming from Pederson’s actions. Gallogly, 970 So.2d at 471. But Moore made absolutely no argument suggesting how he had done that, either in his briefing before this Court or that before the district court, nor did he point to any facts evidencing that he suffered severe emotional distress.
Accordingly, we hold that Moore has not established a claim for intentional infliction of emotional distress because he has not shown that Moore suffered “severe” emotional distress as a result- of Pederson’s actions.
VII.
Home may be where the heart is,[19] but it cannot be where the government is — at least for purposes of conducting a Terry-like stop, in the absence of exigent circumstances. Today we clearly establish this as the law in this Circuit. But since the law was not clearly established on this point when Pederson engaged in the Terry-like stop of Moore while Moore was in *1055 his home, the district court, did not err when it granted qualified immunity to Ped-erson on this issue. The district court likewise did not err in granting qualified immunity to Pederson regarding his arrest of Moore while Moore was in his home. The law was not clearly established at the time of the arrest that Moore’s compliance with Pederson’s demands that he turn around and present his hands for cuffing did not constitute consent. Finally, the court did not err in determining that Moore failed to establish a claim for intentional infliction of emotional distress. For these reasons, the district court’s order is AFFIRMED.

. L. Frank Baum, The Wonderful Wizard of Oz 46, http://ir.nmu.org.ua/bitstream/handle/ 123456789/123102/cb6151959dc6ecf6e7 ldc 17715e88d24.pdf?sequence=l. A copy of this webpage is available on file in this case with the Clerk’s Office.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. We find that this case does not involve exigent circumstances, so we do not explore today what particular exigent circumstances may justify an officer's entry into a home without a warrant and may permit the officer to conduct what is effectively a Terry stop inside the home.

. Pederson attested that the arrest and handcuffing occurred outside of Moore's apartment. Since we are reviewing the entry of summary judgment against Moore, however, we accept for purposes of our analysis Moore’s version of the facts where a conflict between Moore's and Pederson’s stories exists.

. Again, the parties’ versions of the facts diverge here. Pederson asserted that Moore *1041 wore a towel that remained on throughout the entire period that he was in Pederson's custody. And, in fact, records reflect that Moore had a towel with him when he arrived at the station. We nevertheless accept Moore’s version of the facts in determining whether the district court correctly granted summary judgment to Pederson.

. Besides these claims, Moore’s amended complaint alleged state-law claims for false arrest and malicious prosecution against Ped-erson and also asserted claims of invasion of privacy and failure to train and supervise in violation of 42 U.S.C. § 1983 against several other entities. The district court dismissed all of these claims. On appeal, without identifying any issues relating to these claims in his statement of issues and without making any actual arguments about these claims in his appellate brief, Moore attempts to incorporate by reference his arguments regarding these other state claims contained in his brief in opposition to Pederson's motion for summary judgment filed in the district court, explaining that he does so ”[i]n the interest of page limits compliance.” We have explained many times that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.” Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir.2004); see also Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir.2014). Good reasons for this rule exist. Among others, Moore’s brief opposing summary judgment before the district court does not explain what defects Moore perceives in the district court’s ruling, which was obviously entered after Moore filed the brief that he asks us to consider. So we (and Pederson) would have to divine what in particular Moore thought was problematic about the district court's decision. That is not how our adversarial system works. We further note that nothing prevented Moore from requesting permission to exceed the page limit if he had good cause to do so, but Moore never made such a request. Because Moore has not briefed any issues regarding these other state-court claims, any issues relating to them are deemed abandoned.

. Although Moore argues in his opening brief 'on appeal that Pederson was not acting within the scope of his duties, Moore did not raise this challenge in response to Pederson’s motion for summary judgment ‘in front of the district court. Consequently, Moore forfeited this argument. Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir.2009) ("[Ajbsent extraordinary circumstances, legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal.”). And even if he had not forfeited the argument, we find that it lacks merit.

. The Third Amendment, which is not at issue in this case, provides, "No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law.” U.S. Const, amend. III.

. If we were speaking in terms of football, we might say that it is a Fourth Amendment violation if any part of the law-enforcement officer breaks the plane of the home to conduct a warrantless arrest without probable cause and either consent or exigent circumstances. See 2015 NFL Rulebook, Rule 3, § 39, http://operations.nfl.com/the-rules/2015-nfl-rulebook/ ("It is a Touchdown if any part of the ball is on, above, or behind the opponent’s goal line while legally in possession of an inbounds player, provided it is not a touch-back.”) (emphasis added).

. Even if he is not, Pederson could have lawfully knocked on Moore's front door seeking to ask him questions outside the context of a Terry stop. Morris v. Town of Lexington, Ala., 748 F.3d 1316, 1324 (11th Cir.2014) (citing Florida v. Jardines, -U.S.-, 133 S.Ct. 1409, 1416, 185 L.Ed.2d 495 (2013)). As we have explained, “officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just [as] any private citizen may." United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir.2006) (alteration, internal quotation marks, and citation omitted). But an important difference exists between a Terry stop and the type of interaction that occurs when a person responds to an officer’s knock on the door and engages in conversation with that officer: the mandatory versus the voluntary nature of the interaction. In the Terry stop, the person is detained within the meaning of the Fourth Amendment; he cannot simply walk away or otherwise avoid the encounter. But when a citizen is not detained by a Terry stop or otherwise lawfully detained and chooses to speak with an officer, that citizen has the right to cease answering questions and walk away from the officer; the encounter is entirely voluntary. When this type of interaction occurs as the result of a citizen's decision to speak with officers after they knock on the door of his home, provided that no warrant or probable cause and exigent circumstances exist, the citizen has the right to terminate his voluntary participation in the conversation by retiring into his home and closing the door.

. As for the cases from other jurisdictions, first, in and of themselves, they cannot clearly establish the law in this Circuit. See McClish, 483 F.3d at 1237. Second, the Ninth Circuit cases that Moore cites — United States v. Struchnan, 603 F.3d 731, 738 (9th Cir.2010), and United States v. Perea-Rey, 680 F.3d 1179, 1185-86 (9th Cir.2012) — both postdate the events in this case, so they could not have put Pederson on notice that Terry-like stops cannot occur in the home even outside this Circuit. And finally, as of the time of the events in this case, at least one circuit had applied a Terry analysis to an investigatory stop of people in their hotel room, suggesting that if sufficient facts to establish reasonable suspicion exist, a Terry-like stop may be conducted in the home. See United States v. Jerez, 108 F.3d 684, 693-94 (7th Cir.1997). This means that in the absence of caselaw on this point from the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court, at best, disagreement among other circuits existed as to whether a Ferry-like stop could be conducted in the home. "If judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.” McClish, 483 F.3d at 1249 (citation and internal quotation marks omitted).

. The Dissent cites Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) and Hidalgo, 7 F.3d 1566, in support of the general proposition that "[sjubmission to law enforcement commands is not consent.” Dissent at 1059. Royer involved a warrantless arrest in a public space (an air-' port), 460 U.S. at 493-94, 103 S.Ct. 1319 and Hidalgo concerned the voluntary consent to .a search following a lawful arrest in the home. 7 F.3d at 1571. Neither resolves the issue here. As for United States v. Edmondson, 791 F.2d 1512 (11th Cir.1986), in that case, the FBI, with weapons drawn, surrounded a home, knocked on the door, and, when the defendant looked outside and saw the assemblage, an agent yelled, "FBI. Open the door.” Id. at 1514. The defendant opened the door, stepped back, and placed his hands on his head in response. Id. Unlike in Berkowitz and Moore's case, where the officer’s weapon remained holstered and the officer simply used his voice to obtain Moore’s compliance, Edmondson involved a clear show of overwhelming force that was used to obtain the defendant’s submission.

. MeClish clearly established that an officer may not execute a warrantless arrest without probable cause and either consent or exigent circumstances, even if the arrestee is standing in the doorway of his home when the officers conduct the arrest. What it did not clearly establish was the entirely separate question of the meaning of "surrender” and therefore "consent” in the context of an in-home arrest. Significantly, unlike Moore’s case, MeClish did not involve lawful police commands. In MeClish, the officers rushed into McClish’s home and arrested him without giving him an opportunity to consent or surrender. As a result, the boundaries of McClish’s reference to "surrender” as consent were not clear.

. The Dissent's discussion about "McClish’s reference to ’surrendering’ [not being] meaningless” necessarily demonstrates the confusion surrounding the term prior to today. See Dissent at 1060 n. 1. In this regard, the Dissent seeks to explain the term, at least in part, by suggesting that "there is no 'entry based upon inferred consent' if an arrestee surrenders by voluntarily stepping putside to submit to an arrest.” Id. First, in such a case, there is no entry at all because the arrestee has left the home. So that leaves open the question of what constitutes "surrender” and therefore consent allowing an arresting officer to enter the home for the purpose of executing an arrest. And second, the Dissent does not explain how Pederson should have known that this was what MeClish supposedly meant when it invoked the term "surrender” and cited Berkowitz.

. We do not suggest that this interpretation is the current law of the Seventh Circuit. Reasonable officers in the Eleventh Circuit are not charged with knowing the law in the Seventh Circuit. Therefore, Pederson’s duty to know Seventh Circuit law began and ended with Berkowitz because of McClish’s citation of Berkowitz regarding "surrender” as consent.

. We respectfully disagree with the Dissent that we have failed to view the facts in the light most favorable to Moore. See Dissent at 1060-62. Nor does the Dissent identify a single part of the record that conflicts in any way with the facts as we have set them forth in the light most favorable to Moore. Instead, the Dissent suggests that we have failed to meet this standard simply because Moore argued in his' summary-judgment brief that he "did not consent to the interaction.” See id. at 1061. As we have explained above, however, the question on qualified immunity is not whether, in Moore’s mind, Moore viewed himself as consenting to entry for purposes of arrest. Nor could it be; there is no way for a reasonable officer to know what is inside the mind of another individual. The question instead is whether a reasonable officer in Ped-erson's position could have understood Moore’s words (or lack thereof) and actions, as set forth in the light most favorable to Moore, to have evidenced consent on Moore's part.

. Pederson contended that the towel remained on Moore throughout the arrest and right up until Moore’s processing. He further asserted that Moore had clothes with him in Pederson’s vehicle because one of the two women brought Moore clothes to put on for when he bonded out of jail. Pederson stated that he took Moore's clothes to the jail for him. We also note that Moore’s processing report shows that he was booked with a towel, meaning that under Moore's version of the facts, Pederson would have had to have stopped to pick up the towel from the ground when it fell off, or someone else would have had to have provided the towel to Pederson so that Moore could have it at the time that he was processed. For purposes of evaluating the entry of summary judgment against Moore, though, we accept Moore’s version of the facts.

. “Home is where the heart is” is a quotation often attributed to Pliny the Elder, also known as Gaius Plinius Secundus. Tragically and perhaps ironically, Pliny the Elder died trying to save his family and his friend Pom-ponianus from their homes in the aftermath of Mount Vesuvius's eruption.