[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17607

_____

D.C. Docket No. 6:14-cv-00877-GAP-DCI

OBERIST LEE SAUNDERS,

Plaintiff - Appellee,

versus

SHERIFF OF BREVARD COUNTY,
in his official capacity,

Defendant - Counter Claimant -
Appellant,

SUSAN JETER,
in her individual capacity,
JOHN C. WRIGHT,
in his individual capacity,

Defendant - Appellants,

PATRICIA TILLEY,
in her individual capacity,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 17, 2018)

Before MARCUS, MARTIN, and NEWSOM, Circuit Judges.

PER CURIAM:

**I**

**A**

Oberist Saunders arrived at Florida's Brevard County Jail in June 2008 following his arrest for armed robbery.  A little more than a month into his incarceration, Saunders cut his wrists in an unsuccessful suicide attempt.  A jail guard noticed Saunders' wounds and called paramedics, who promptly transferred Saunders to the nearest hospital.  When he returned to the Jail later that same day, Saunders was placed in "the acute mental health housing unit," also known as "the Bubble."  Saunders spent a total of 69 days in the Bubble—65 during his post-suicide stay in 2008, and four more during a case-related status hearing in 2013. The issues in this appeal relate exclusively to Saunders' time in the Bubble, during which he claims that officers violated his constitutional rights under the Eighth and Fourteenth Amendments.

2

**B**

Saunders alleges that the Bubble's conditions were unconstitutional for a variety of reasons. For starters, he claims that the Bubble's cells were overcrowded. Saunders testified that the cells' occupancy frequently vacillated, with as few as three and as many as eight occupants in a cell "no larger than 9-by-15," which, he said, increased tensions among inmates and inhibited his ability to exercise. Other Bubble inmates echoed Saunders' claim, explaining that the dense occupancy produced conflicts when, for example, inmates' sleeping mats would unavoidably overlap, or when urine would splash from the cell's communal toilet onto an inmate's sleeping space.

Saunders also alleges significant problems with the Bubble's sanitation standards. In particular, he claims that inmates would urinate, defecate, and ejaculate in their cells, and that the authorities wouldn't clean the resulting residue for several days. Saunders further contends that some inmates would intentionally stop up the cell toilets, thus flooding the cells and contaminating others' sleeping mats or blankets, and that the officers would leave the mess "to sit in there for a while, basically like a punishment." (Saunders admits, though, that this never happened to him personally.) Moreover, Saunders states that he never received new blankets or mats, even after, for instance, a fellow inmate with bleeding lesions on his feet repeatedly stomped on his blanket. Saunders finally alleges

3

(with respect to sanitation) that even when officers would clean the cells—which, according to him, happened twice a week—he never saw them change the mop water, and that therefore much of the cleaning was ineffective.

Beyond concerns over sanitation, Saunders also complains about his (enforced) inability to maintain personal hygiene. The Jail, he says, would permit the Bubble's inmates to access hand soap, utensils, and toilet paper only upon request. Although this policy stemmed from the Jail's concern that inmates might attempt to hurt themselves or others, Saunders insinuates that even after inmates had requested the products, officers would intentionally delay providing them for unreasonable periods of time. In the same vein, Saunders complains that the officers restricted his access to showers, only permitting a full shower about twice a week.

Saunders also claims to have suffered physical discomfort—and even harm—in the Bubble. According to Saunders, the Bubble's cells were always hot and moldy, and the general climate was inadequately maintained. Once, Saunders says, the stifling discomfort of his cell's temperature caused him to lapse into a panic attack in which he repeatedly slammed his head against a metal doorframe, resulting in a gashed scalp and stitches. Saunders separately claims to have suffered physical violence when a fellow inmate brutally attacked him in his sleep,

4

although the evidence is clear that the officers on duty intervened and stopped the attack immediately and that the onsite nurse cleared Saunders of any injury.

## C

Saunders brought suit against various state employees and Jail officers in Florida state court. The defendants removed the case to the United States District Court for the Middle District of Florida. Saunders eventually filed his Third Amended Complaint, in which he alleged claims against Sheriff Wayne Ivey under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and against ten other defendants in their individual capacities under 42 U.S.C. § 1983. The defendants subsequently moved for summary judgment on both the merits of the constitutional claims and the defense of qualified immunity.

The district court granted in part and denied in part the defendants' motion for summary judgment, determining that a jury would have to resolve various issues of fact related to the defendants' qualified-immunity defenses. On December 16, 2016, the defendants timely appealed to this Court. Claims against three officers remain for us to consider on appeal: Saunders asserts (1) that, under *Monell*, Sheriff Ivey is liable in his official capacity for the unconstitutional conditions in the Jail; (2) that Commander Susan Jeter faces supervisory liability for unconstitutional conditions in the Jail; and (3), that Officer John Wright—the

5

"Officer in Charge" of the Bubble during most of Saunders' tenure—is personally liable for unconstitutional conditions of confinement.

While we lack jurisdiction to review Saunders' *Monell* claim against Ivey, we conclude that the district court improperly denied qualified immunity to defendants Jeter and Wright. As to those two defendants, we therefore reverse.

## II

We may exercise appellate jurisdiction over the denial of qualified immunity on a motion for summary judgment, *see Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018-19 (2014), but we lack jurisdiction to conduct interlocutory review of Saunders' *Monell* claim against Sheriff Ivey. The defendants urge us to exercise pendent jurisdiction over the *Monell* claim because it is, they say, "inextricably intertwined" with our qualified immunity analysis. We disagree. While it is true that an absence of any constitutional violation would be fatal to assertions of both personal and *Monell* liability, it remains the case that these forms of liability are subject to different standards. For instance, if officers violated a plaintiff's constitutional rights but those rights were not "clearly established," then *Monell* liability could survive even though qualified immunity would preclude individual liability.

For these reasons, this Court has previously found *Monell* issues sufficiently distinct from issues relating to qualified immunity, and has thus held *Monell* claims

ineligible for interlocutory review.  *See Jones v. Cannon*, 174 F.3d 1271, 1293 (11th Cir. 1999); *Pickens v. Hollowell*, 59 F.3d 1203, 1208 (11th Cir. 1995); *Haney v. City of Cumming*, 69 F.3d 1098, 1102 (11th Cir. 1995).  The defendants have failed to persuade us that we may—let alone should—chart a different course here. We therefore address in this appeal only whether defendants Wright and Jeter are entitled to qualified immunity.

## III

"We review *de novo* the denial of a motion for summary judgment by a district court on the basis of qualified immunity, construing all facts and making all reasonable inferences in the light most favorable to the non-moving party." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004).  "As this Court has repeatedly stressed, the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.  Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff."  *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (citation and quotation marks omitted).   Our pro-plaintiff perspective notwithstanding, however, "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Herrington*, 381 F.3d at 1247.

7

Our review begins with qualified immunity's threshold question: Whether the defendants were "acting within the scope of [their] discretionary authority." *Moore v. Pederson*, 806 F.3d 1036, 1042 (11th Cir. 2015). The term "discretionary authority" includes "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Id.* (internal quotations omitted). Because Saunders' claims clearly focus on instances in which the defendant officers were acting within their discretionary authority, "the burden shifts to [Saunders] to demonstrate that qualified immunity is inappropriate." *Id.*

Qualified immunity is a "muscular doctrine," *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996), and Saunders must satisfy both elements of a two-pronged inquiry in order to prove the officers' individual liability. "The first [prong] asks whether the facts, 'taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (alterations omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation"—and thereby shields government actors "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at

8

1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The Supreme Court has held that courts may engage these issues in either order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A constitutional right is "clearly established" only if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope*, 536 U.S. at 739 (quotation marks omitted).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quotation marks and citations omitted).  Even in the absence of binding caselaw, conduct may occasionally be so obviously unconstitutional that a previous on-point decision is unnecessary.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  Simply put, qualified immunity's clearly-established inquiry reduces to whether the state of the law at the time of the defendants' alleged violations gave the defendants "fair warning" that their alleged actions were unconstitutional.  *Hope*, 536 U.S. at 741.

As already noted, Saunders alleges Eighth Amendment violations.  In order to establish that conditions of confinement are unconstitutional, a plaintiff must satisfy each element of a multi-tiered inquiry.  The first element sets an objective hurdle, where "a prisoner must prove that the condition he complains of is

9

sufficiently serious to violate the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (quotation marks omitted). An objective Eighth Amendment violation "must be extreme" and deprive the prisoner "of the minimal civilized measure of life's necessities." *Id.* (quotation marks omitted) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The second requisite element is a subjective one: "[T]he prisoner must show that the defendant prison officials acted with a sufficiently culpable state of mind with regard to the condition at issue." *Id.* (quotation marks omitted). Negligence is not enough; the officer "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1289-90 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Finally, and separately, the plaintiff must prove "a causal connection between the defendants' conduct and the Eighth Amendment violation." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

Despite their troubling nature, none of Saunders' allegations withstands the defendants' qualified-immunity defenses. In the sections that follow, we examine Saunders' specific allegations one by one. After that, we address the district court's conclusion that Saunders' complaints, even if insufficient standing alone to state a clearly established constitutional violation, might do so in combination.

10

**A**

There is no doubt that the facts of this case, when viewed in Saunders' favor, paint a disturbing picture of confinement in the Brevard County Jail.  Taking Saunders' allegations at face value, we have evidence of densely packed cells and undoubtedly difficult living conditions.  We take none of this lightly.

As Saunders repeatedly contends throughout his brief, such conditions may well fall short of the Florida Model Jail Standards.  But our limited authority does not extend to the question whether the defendants have comported themselves in accordance with state law; that is a question for another day, and probably for another court.  Rather, in this appeal we are concerned only with the rights that the United States Constitution guarantees, and whether the Brevard County Jail fell short of constitutional requirements—and, importantly, because we are faced with qualified-immunity defenses, did so in a way that violated "clearly established" federal law.  Because Saunders cannot prove that the Jail's conditions—as trying as they may have been—violated his clearly established constitutional rights, we must grant qualified immunity to defendants Wright and Jeter.  This section addresses  Saunders' separate claims in turn, ultimately resolving each in the defendants' favor.

**1**

11

Saunders first alleges that the Bubble's population density produced "overcrowding" that violated his Eighth Amendment rights. According to Saunders' testimony, the number of inmates in the Bubble—"no larger than 9-by-15"—fluctuated and at times held as many as eight occupants. Saunders also argues that the occupancy levels "engendered violence" and cites testimony alleging space-related squabbles. We do not doubt that such tight quarters may cause discomfort—particularly when we consider the necessary proximity between the cell's toilet and inmates' sleeping arrangements. But for better or worse, comfort is not the Constitution's test, *see Rhodes*, 452 U.S. at 349 (explaining that "the Constitution does not mandate comfortable prisons," and that prisons housing serious criminals "cannot be free of discomfort"); rather, we are concerned here with whether the Jail denied Saunders the "minimal civilized measure of life's necessities." *Id*. at 347.

The Supreme Court examined the constitutional limits of overcrowding in *Rhodes* and ultimately determined that "double celling" did not violate the Eighth Amendment because the practice "did not lead to deprivations of essential food, medical care, or sanitation." *Id*. at 347-48. Our Court has followed the Supreme Court's lead: "In assessing claims of unconstitutionally overcrowded jails, courts must consider the impact of the alleged overpopulation on the jail's ability to

12

provide such necessities as food, medical care, and sanitation." *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985).

In its decision to deny the officers' qualified-immunity defenses on summary judgment, the court below stretched *Rhodes* past its breaking point. From *Rhodes*' premise that "cells at double capacity do *not* violate the Eighth Amendment," the district court reasoned to the conclusion that cells past double capacity *do* violate the Eighth Amendment—and, indeed, do so clearly enough to defeat qualified immunity. With respect, that does not follow. *Rhodes* holds only that double-celling falls within constitutional parameters; it does not hold (or even suggest) that anything north of double-celling falls without. Contrary to the negative implication that the district court drew, the Supreme Court's holding in *Rhodes* does not provide a one-size-fits-all framework for the constitutionality of prison occupancy, let alone demarcate double-occupancy as the Constitution's hinge point. And in any event, a mere negative implication, even if granted—here, that greater prisoner density might run afoul of the Constitution—cannot be the basis for a clearly established right for qualified-immunity purposes.

Saunders fails to offer any precedent—for *Rhodes* does not do it—establishing that the Bubble's occupancy violated the Constitution, much less that the officers culpably acted with "fair warning" of such a violation. *Hope*, 536 U.S.

13

at 741.  The district court therefore erred when it denied qualified immunity on this ground.

**2**

Saunders also claims that the defendants violated the Eighth Amendment by not giving him "any exercise time, recreation time, or any time outside" during his stay in the Bubble.  Importantly, however, Saunders has never alleged that the officers in fact denied him the ability to exercise; instead, Saunders says only that he "was never offered rec," that he "didn't know [that the officers] let people out for rec," and that he only learned of recreational opportunities "after [he] got out and went back into mental health housing and saw it when [he] went to rec from there."  Another inmate provided similar testimony, explaining that he was "not aware that [he] could have [recreation time]."  The district court determined that these statements produced a question of fact about whether the officers violated Saunders' clearly established Eighth Amendment rights, and denied the officers' qualified-immunity defense.

On its path to a triable issue of fact, the district court stated that "there [was] no evidence refuting Plaintiff's claim that he did not have the ability to exercise in his cell."  The district court erred here in a few ways.  First, the court misstated Saunders' claim—Saunders claimed only that he was ignorant of potential recreation time and that the officers never affirmatively offered it to him.  Second,

14

Saunders' testimony suggests that the cell's occupancy was constantly changing, and, at least some of the time, only "three or four" inmates shared the space. If Saunders' alleged "9-by-15" cell dimensions are accurate, then three or four inmates would each have somewhere around 35-to-45 square feet of room to exercise during periods of low occupancy, which would provide ample space for most any stationary exercise regimen.

Finally, the district court failed to recognize that this Court's holding in *Bass v. Perrin*, 170 F.3d 1312 (11th Cir. 1999), precludes the possibility that a right to be offered recreation time during confinement could be clearly established. In *Perrin*, we held that "complete *denial* to the plaintiffs of outdoor exercise, although harsh, did not violate the Eighth Amendment" because there was a "penological justification" for keeping the plaintiffs in solitary confinement. *Id.* at 1316-17 (emphasis supplied). Here, Saunders' suicide attempt justified the officers' decision to assign Saunders to the Bubble, and the record before us does not demonstrate restrictions even as severe as those that *Perrin* deemed constitutional—that is, Saunders does not allege "complete denial . . . of outdoor exercise," let alone that the defendants deliberately violated any clearly established constitutional right.

15

### 3

Saunders' unsanitary-conditions allegations undoubtedly pose this case's most difficult questions. Saunders seems to allege three discrete violations: (1) deprivation of toiletries; (2) inadequate cell cleaning; and (3) inadequate blanket cleaning. When viewed in the light most favorable to Saunders, the record presents evidence of undoubtedly unpleasant conditions. Even so, we conclude that none of Saunders' claims can overcome the defendants' qualified-immunity defenses. While we take no particular pleasure in foreclosing Saunders' suit, we have no other choice; Saunders has simply failed to meet his burden under our qualified-immunity framework.

### a

Saunders and fellow inmates testified that the defendant officers failed to provide the inmates with ready access to soap or toilet paper, instead providing these items only on request and, at times, taking up to 45 minutes to do so. The officers do not dispute Saunders' assertions. Indeed, the officers explain that this temporary deprivation was a feature, not a bug; the Jail intentionally restricted the Bubble's inmates' access to these items due to concerns over their physical safety and potential for self-harm.

Saunders' toiletries-related assertions cannot overcome the defendants' qualified-immunity defenses. In similar cases, this Court has "consistently held

16

that prison officials have a broad discretion to determine the methods by which they will carry out their responsibilities," particularly in the province of prisoner safety. *McMahon v. Beard*, 583 F.2d 172, 175 (5th Cir. 1978) (holding that depriving a suicidal inmate of all clothing and sheets for three months did not violate the Constitution).[1]  Saunders fails to cite any precedent to demonstrate that a prison procedure that temporarily inhibits suicidal inmates' access to toiletries so plainly violates an inmate's clearly established Eighth Amendment rights that qualified immunity does not apply.  In fact, available precedent (albeit from other circuits) seems to point decisively in the other direction.  *Contrast, e.g.*, *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994)  ("The chance of harm resulting from the temporary failure to provide personal hygiene items is too remote for plaintiffs to meet th[e] subjective requirement [of an Eighth Amendment claim].").[2]

**b**

---

[1] Decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981, are binding on this Court. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

[2] The dissent analogizes this case's facts to those in *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991), to support the contention that the guards' policy of temporarily depriving inmates of toiletries violated Saunders' clearly established Eighth Amendment rights.  Dissent at 31-32, 41-43.  But *Baird* is inapposite; there, we held that *permanent* deprivation of certain toiletries—combined with other sanitation issues that are absent from this case—violated the Eighth Amendment.  *Baird*, 926 F.2d at 1063.  Here, by contrast, Saunders and his fellow inmates only allege that they did not have unfettered access to soap in their cells, and Officer Wright's unrebutted testimony explains that "[t]oilet paper and soap were available to inmates upon request."

17

Saunders also argues that the officers were deliberately indifferent to the Bubble's sanitation, thus producing unconstitutionally unsanitary conditions in the cells. Saunders alleges two theories to support this contention. First, he claims that neither he nor his fellow inmates ever "observed Jail orderlies change mop water" when the orderlies cleaned the inmates' cells, even when the toilets overflowed. Second, he alleges that inmates would urinate, defecate, and ejaculate onto the cell's floors and walls, and that the "Jail staff did not clean human waste from inmate cells for 'days.'" Although testimony from officers and fellow inmates contradicts the testimony on which these claims rely, at this stage we must focus only on the testimony that supports Saunders' allegations and take this evidence as fact. *See Ferraro*, 284 F.3d at 1190.

We can make quick work of the first theory, since the evidence which Saunders provides—testimony alleging that officers would use the same mop bucket for the Bubble's 18 cells—cannot without more detail (*e.g.*, potential proof of the cleaning chemicals' complementary ineffectiveness) create "an objectively unreasonable risk of serious damage to his future health." *Brooks*, 800 F.3d at 1303 (quotation marks omitted). More importantly for the purposes of this analysis, however, Saunders fails to show that our caselaw has clearly established the unconstitutionality of such a practice.

18

Saunders' second theory is more serious. In *Brooks*, this Court reviewed a ghastly record in which officers allegedly denied an inmate the ability to lower his pants while defecating, and, "[a]s a result, [the inmate] was forced to defecate into his jumpsuit and sit in his own feces for two days . . . ." 800 F.3d at 1303. There, we looked to the "'well established' Eighth Amendment right 'not to be confined in conditions lacking basic sanitation'" and found that the "allegations state[d] an Eighth Amendment violation under our caselaw." *Id.* (quoting *Chandler v. Baird*, 926 F.2d 1057, 1065-66 (11th Cir. 1991)) (alterations omitted). Although Saunders' allegations fall short of the egregious facts in *Brooks*, cases in which "the deprivation of basic sanitary conditions … constitute an Eighth Amendment violation" are plentiful, and some of them expressly hold that extended exposure to human excrement violates the Constitution. *See id.* at 1304 (listing numerous cases from "every sister circuit (except the Federal Circuit)" in which courts have found that unsanitary conditions violated a plaintiff's Eighth Amendment rights).

Nevertheless, even if we were to grant the assumption that the evidence before us could demonstrate levels of sanitation violative of Saunders' rights, Saunders' claims would still fail to shoulder their heavy burden under our Eighth Amendment qualified-immunity jurisprudence. Beyond our framework's first hurdle—that is, showing that the prison conditions deprived the inmate "of the minimal civilized measure of life's necessities," *Chandler*, 379 F.3d at 1289—a

19

plaintiff still must satisfy two further conditions in order to overcome a defendant's qualified-immunity defense. The framework's second, subjective prong requires the plaintiff to prove that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that the defendant] also [drew] the inference." *Id.* at 1289-90; *see also Farmer*, 511 U.S. at 838; *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Then, after satisfying both the objective and the subjective tests, the plaintiff finally must show that "a causal connection" exists between the defendants and the Eighth Amendment violation. *Brooks*, 800 F.3d at 1301. No matter how favorably we construe the record before us, Saunders cannot meet these hefty requirements.

Saunders fails to present evidence that Commander Jeter knew or inferred that the Bubble was unconstitutionally unsanitary during the time that Saunders was detained there. In his attempt to meet this requirement, Saunders offers three pieces of evidence. First, Saunders cites his "appeal of grievance #09001676," which he filed on July 23, 2009. But the grievance appeal never mentioned the Bubble's sanitation conditions; instead, the appeal focused entirely on Saunders' dissatisfaction with medical treatment that he received in the prison. Second, Saunders cites a fellow inmate's deposition testimony in which the inmate stated that "several inmates" complained about their conditions of confinement, and that "[Jeter] said she would address [the issues] but that never changed." Not only does

20

the inmate's statement constitute inadmissible hearsay which "cannot be considered on a motion for summary judgment," *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999), but the testimony refers only to general sanitation concerns and does not corroborate Saunders' specific claims—in fact, this inmate described conditions in which officers would take, at most, "three, four hours" to clean a befouled cell, and therefore the conditions about which the inmate alleges Jeter was aware would likely have fallen within constitutional bounds. Third, Saunders points to a letter that he sent on February 19, 2009, which, though it was not addressed to Jeter, was likely received and reviewed by him. Notably, unlike the appeal of the grievance, the letter does contain fairly detailed descriptions of the unsanitary conditions in the Bubble. However, even assuming that the letter creates a material issue as to whether Jeter knew of the unsanitary conditions in the Bubble, the letter was not written until approximately five months after Saunders was discharged from the Bubble in 2008. Accordingly, the letter does not demonstrate that Jeter's alleged action or inaction with respect to the conditions in the Bubble had any causal connection to the 65 days that Saunders spent there in 2008, and thus cannot support Saunders' claimed constitutional deprivation. *See Brooks*, 800 F.3d at 1301.

Saunders' attempt to prove Officer Wright's "culpable state of mind" fares no better. Saunders asserts that "Wright's mere presence in the Bubble on a daily

21

basis is itself sufficient to deny summary judgment because there is a factual issue as to whether he personally observed the inhumane conditions of confinement that Saunders experienced."  Even if his conclusion logically followed, Saunders' argument omits essential—and undisputed—facts that are fatal to his premise. Wright testified without contradiction that he worked "twelve hour day shifts, three to four days per week."  Saunders spent 69 days in the Bubble.  Vague allegations that "Jail staff did not clean human waste from inmate cells for 'days,'" without a more specific indication that Wright in particular (who worked only three to four days a week) was present to witness the problems, simply are not sufficient to demonstrate that Wright himself displayed the deliberate indifference that our Eighth Amendment jurisprudence requires.[3]

<strong>c</strong>

Beyond the insufficient access to toiletries and indifference to cleanliness, Saunders also alleges that "the Jail never washed his Jail-issued blanket and never did a blank[et] exchange."  But the testimony to which Saunders cites to support this claim alleges only that "[the Jail] didn't do a blanket exchange," meaning that inmates "pretty much had the same blanket the whole time [they] [were] in there"; Saunders cites to no evidence—not even his own testimony—to support the claim

---

[3] To be clear, Saunders' allegation fails not because of Officer Wright's "part-time" employment status (Dissent at 34), but instead, as explained in text, because Saunders fails to adequately show that Officer Wright clearly knew about the alleged delay in cleaning human waste.

that the "Jail never washed his Jail-issued blanket." To the contrary, Saunders testified that he "would see [the officers] wash and reuse the blankets."

**4**

The last claim for us to consider is Saunders' assertion that "Wright forced Saunders to sit in dangerously high temperatures" and provided inadequate ventilation in his cell, which, Saunders says, ultimately caused him to "suffer[] a mental breakdown and panic attack." This is a serious allegation, as we have recognized that "the Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation." *Chandler*, 379 F.3d at 1294. Our Eighth Amendment jurisprudence focuses on "both the severity and the duration of the prisoner's exposure to inadequate cooling and ventilation," even while recognizing that "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Id.* at 1295 (quotation marks omitted).

Even the most charitable view of the record before us does not show that the Bubble's ventilation—or lack thereof—produced the "excessive risk to inmate health or safety" that the law requires. *Farmer*, 511 U.S. at 837. Although Saunders testified that "it was summer, so the cells were always hot" and that he found the ventilation unsatisfactory, he provides only one specific example of what he alleges to have been unconstitutionally inadequate cooling: For a period of up to two days, the "AC vent . . . was blowing no air" and had "stopped working," thus

23

allegedly causing Saunders to experience a panic attack during which he repeatedly slammed his head against a metal doorframe, resulting in gashes and stitches.

While surely unpleasant, this episode does not describe clearly unconstitutional conditions.  Indeed, this Court has held that a Florida prison did not violate the Eighth Amendment even when it provided no air conditioning whatsoever during the summer months.  *See Chandler*, 379 F.3d at 1297-98.  And ultimately, Saunders' extreme reaction cannot alter our analysis; to hold otherwise would permit an inmate's subjective characteristics and behavior to bend objective standards, directly contravening our binding precedent.[4]

**B**

Having determined that none of Saunders' individual allegations can overcome the defendants' qualified-immunity defenses, we must address a final, critical error in the district court's holding.  The court reasoned that even though "some of Plaintiff's complaints standing alone . . . may not pass constitutional

---

[4] The dissent asks, "How can it be disputed that during the five minutes Mr. Saunders was banging his head against the steel door—with blood streaming down his face—he was under a 'substantial risk of serious harm'?"  Dissent at 36.  With respect, we think that the premise of the question misses the mark, for it is the *conditions themselves* that must pose the "risk of serious harm."  *Farmer*, 511 U.S. at 834.  The dissent attempts to bridge that gap by rehashing Saunders' panic-attack episode, suggesting that the guards knew of Saunders' capacity for self-harm, and then concluding that "the circumstances created a substantial risk that [Saunders'] mental condition would severely deteriorate," thus "satisfy[ing] the Eighth Amendment's objective prong."  Dissent at 37.  But the cases that our colleague cites for support are inapposite and do not suggest that the Bubble's temporary ventilation failure violated any constitutional right, let alone one that is clearly established.

24

muster," Supreme Court precedent permits the amalgamation of otherwise insufficient claims because "*some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone . . . ." Dist. Ct. Op. at 22-23 (quoting *Wilson*, 501 U.S. at 304 (emphasis in original)). The district court thus concluded that "whether a combination of these issues constitutes cruel and unusual punishment is an issue of fact for the jury to decide."

But the district court's ellipses mute essential text in which the *Wilson* Court qualified its preceding statement, explaining that such aggregation may occur "only when [the alleged violations] have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at 304. Contrary to the district court's suggestion, the *Wilson* Court expressly stated that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

The district court failed to identify what "single human need" the Jail's conditions denied Saunders, and seems to have engaged in the very sort of reasoning that the *Wilson* Court's guidance prohibits—that is, vague disapproval of Saunders' overall confinement conditions. Moreover, even when we analyze all of Saunders' claims holistically, the broad swath of allegations fails to illustrate the

25

deprivation of either the *Wilson* Court's "single, identifiable human need"—whether "basic sanitation" (Dissent at 30) or otherwise—or the *Rhodes* Court's "minimal civilized measures of life's necessities."[5]

## IV

For the foregoing reasons, we **DISMISS** the defendants' appeal of Saunders' *Monell* claim and **REVERSE** the district court's denial of the defendants' motion for summary judgment on qualified-immunity grounds.

---

[5] The dissent mistakenly suggests that our critique of the district court's analysis indicates that we "did not truly weigh all of this evidence together," even though "our precedent requires us to do so." Dissent at 30. To be clear, we did weigh the relevant evidence together; we have simply concluded that the defendants did not violate Saunders' clearly established Eighth Amendment right to basic sanitation. The problem with the district court's approach was not a problem with amalgamation as such. Rather, the district court erred by combining a variety of Eighth Amendment issues but failing to identify which "single, identifiable human need" was denied. Dist. Ct. Op. at 18-23 (amalgamating disparate allegations, including overcrowding, lack of exercise, cleaning, access to hygiene products, ventilation, temperature, sleeping arrangements, and showering, and ultimately concluding that these, together, may have violated Saunders' Eighth Amendment rights).

MARTIN, Circuit Judge, dissenting in part:

Oberist Saunders filed suit against officials at the Brevard County Jail on account of the squalid conditions he was forced to live in while imprisoned there. Rather than allow Mr. Saunders to present his evidence to a jury, my colleagues in the majority rely on the doctrine of qualified immunity to end his case here. This case involves the denial of basic human necessities, which is a well-established constitutional right, even for prisoners. Our Circuit precedent, properly applied, would give Mr. Saunders an opportunity to redress the harms inflicted on him.

My review of the record reveals that Mr. Saunders has substantiated two independent Eighth Amendment violations that should survive summary judgment. The first is based on Corporal Wright's deliberate indifference to the unsanitary conditions in the acute pod where Mr. Saunders was housed for at least 69 days. The second is based on Corporal Wright's deliberate indifference to Mr. Saunders's panic attack and self-harming behavior on August 3, 2008. The District Court denied qualified immunity to Corporal Wright, and I think it was right to do so. I therefore dissent from the opinion issued by my colleagues reversing the District Court decision in this regard.

27

## I.  LEGAL STANDARD

Eighth Amendment challenges[1] to conditions of confinement require a two-part analysis: an objective inquiry and a subjective one.  Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994).  "First, under the objective component, a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment."  Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (quotation omitted).  The prisoner must show that the condition was "extreme" and that it "pose[d] an unreasonable risk of serious damage to his future health or safety."  Id. (quotations omitted).  "Only a deprivation which denies 'the minimal civilized measure of life's necessities,' is grave enough to violate the Eighth Amendment."  Jordan v. Doe, 38 F.3d 1559, 1564 (11th Cir. 1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981)).

---

[1] Mr. Saunders was locked up in the acute pod both before and after his conviction. "While the conditions under which a convicted inmate are held are scrutinized under the Eighth Amendment's prohibition on cruel and unusual punishment, the conditions under which a pretrial detainee are held are reviewed under the Due Process Clause of the Fourteenth Amendment." Jacoby v. Baldwin Cty., 835 F.3d 1338, 1344 (11th Cir. 2016).  But while the constitutional source differs, this Circuit ruled in Hamm v. DeKalb Cty., 774 F.2d 1567 (11th Cir. 1985), that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." Id. at 1574.

The second step of the analysis is "the subjective component." Id. at 1564. Under this component, the prisoner must show that the defendant prison official acted with "deliberate indifference" toward the conditions at issue. Chandler, 379 F.3d at 1289. Deliberate indifference is established by showing: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Thus, putting the objective and subjective components together, we have said: "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." Marsh v. Butler Cty., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561–63, 127 S. Ct. 1955, 1968–69 (2007).

At this stage in the proceedings, we analyze claims based on "the plaintiff's version of the facts." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

## II.  UNSANITARY CONDITIONS OF CONFINEMENT

A.  OBJECTIVE CONSTITUTIONAL VIOLATION

This Court has "long recognized a 'well established' Eighth Amendment right 'not to be confined . . . in conditions lacking basic sanitation.'" Brooks v. Warden, 800 F.3d 1295, 1303 (11th Cir. 2015) (quoting Chandler v. Baird, 926 F.2d 1057, 1065–66 (11th Cir. 1991)); see also Novak v. Beto, 453 F.2d 661, 665

29

(5th Cir. 1971) (collecting previous cases that held "the deprivation of basic elements of hygiene" violates the Eighth Amendment).  Mr. Saunders's evidence is sufficient for a reasonable jury to find that conditions in the acute pod "lack[ed] basic sanitation."  Brooks, 800 F.3d at 1303 (quotation omitted).  This is true both when considering his sanitation claims in isolation, as the majority did, and in conjunction with his claims of overcrowding and lack of basic hygienic necessities.  The majority did not truly weigh all of this evidence together—performing this analysis in a single sentence—although I believe our precedent requires us to do so.  See Majority Op. 26.  Legal precedent tells us that the conditions complained of "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need": basic sanitation.  Wilson v. Seiter, 501 U.S. 294, 304–05, 111 S. Ct. 2321, 2327 (1991).

Inmates in the acute pod, including Mr. Saunders, were forced to walk barefoot in cells covered with virtually every type of bodily waste and fluid, from urine and feces to semen and vomit.  Because there were no beds in the cells, nor any other type of platform above the floor, Mr. Saunders and his cell-mates had to sleep on mats directly on the waste-filled floor.  Mr. Kenney, another inmate exposed to conditions in the acute pod, described these conditions in his deposition: "I'm walking in [urine,] I'm tracking it across [the cell] and I'm getting it in my mat, then I'm sitting there laying in it. . . . So in essence, I'm sleeping in

30

[urine]." And even though the sleeping bag-style mats were immediately and constantly soiled, Mr. Saunders testified that he was never given new bedding and thus had to sleep on the soiled mat for months at a time.

Beyond the unsanitary sleeping conditions, Mr. Saunders was also forced to eat in unsanitary conditions. The jail prohibited inmates in the acute pod from having soap in their cells and also prohibited (and did not provide) eating utensils. As a result, inmates were forced to eat with their bare hands that they were not able to wash after going to the bathroom. This is especially unsanitary given that the inmates' hands were likely to be exposed to excrement because there was no toilet paper in their cell, and toilet paper was only provided when the inmates requested it. Then when given, it was in inadequate amounts. See Baird, 926 F.2d at 1063–66 (holding that "conditions lack[ed] basic sanitation" in violation of the Eighth Amendment where there was "filth on the cell's floor and walls" and inmates were deprived of "basic hygiene articles" such as "soap, toothbrush, toothpaste, and [clean] linen[s]").

Mr. Saunders was made to live in these conditions for at least 69 days. He has thus shown a "prolonged exposure" to human waste, which we have said "sufficiently allege[s] a substantial risk of serious harm." Brooks, 800 F.3d at 1305; see also DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001) ("Exposure to human waste, like few other conditions of confinement, evokes both the health

31

concerns emphasized in Farmer and the more general standards of dignity embodied in the Eighth Amendment."); Howard v. Adkison, 887 F.2d 134, 136 (8th Cir. 1989) (noting that "inmates are entitled to reasonably adequate sanitation" and finding Eighth Amendment violation where cell was "covered with ... human waste"). Mr. Saunders therefore satisfies the objective element of an Eighth Amendment violation based on the unsanitary conditions in the acute pod.

The majority excused the lack of basic hygiene articles, saying that the Jail "intentionally restricted the Bubble's inmates' access to these items due to concerns over their physical safety and potential for self-harm." Majority Op. 16. But the majority never asked for or got an explanation for how depriving inmates of basic sanitation contributes to that goal. Neither does the majority follow this court's binding precedent in Baird, which held that depriving inmates of "basic hygiene articles" such as "soap, toothbrush, toothpaste, and [clean] linen" violated the Eighth Amendment. Id., 926 F.2d at 1063–64.[2]

The majority also credited the defendants' assertion, as opposed to the facts alleged by Mr. Saunders, that the cells were cleaned to undercut any allegation of unsanitary conditions. All sides agree that jail staff made a pass at cleaning the cells twice a week. However, Mr. Saunders's evidence shows that these

---

[2] Whether the deprivation of toiletries was permanent or temporary, it is clear Mr. Saunders has alleged he was meaningfully deprived of basic human hygiene. See Majority Op. 17 & n.2.

"cleanings" were not adequate to maintain sanitary conditions.  For starters, the cleaning was minimal: the jail did not "wipe down" and "sanitize" the cells, but instead did only "a quick sweep and mop."  Further, the evidence shows that cleaning twice a week simply was not enough.  Washing a cell twice a week might be adequate when a cell holds one or even two or three healthy inmates.  See Novak, 453 F.2d at 665–66 (finding that prison met the "basic elements of hygiene" where single-occupant non-mental health cells "are scrubbed by the guards . . . at least three times a week").  But here there were typically five to eight inmates—many with psychiatric disorders—living in cells that were at most 9 feet by 15 feet.  Because of their mental illness, many of these inmates did not have proper control of their bodily fluids.  The result of overcrowding mentally ill inmates in the acute pod was that urine "was on the floor <u>all the time</u>" and inmates lived, ate, and slept "[t]ightly" "like sardines" on the urine soaked and filthy floor. The facts speak for themselves: the twice weekly cleanings simply did not alleviate the unsanitary state of the acute pod cells.

B.  DELIBERATE INDIFFERENCE TO THE VIOLATION

Mr. Saunders has also established that Corporal Wright was deliberately indifferent to the overcrowded and unsanitary conditions of the acute unit generally.  Corporal Wright was the "Officer in Charge" in the acute pod and "oversaw daily operations" there.  Unlike Commander Jeter, he was not a high-

level administrator far removed from the conditions on the ground.  Corporal Wright stepped in "during deputies' breaks" to do "inmate watches"; "cleaned cells when needed"; and "regularly checked on inmates"  The majority dismisses Corporal Wright's closeness to the conditions in the cells because he "worked only three to four days a week."  Majority Op. 22.  But this ignores what Wright was doing during those days in the pod.  It was Corporal Wright who was directly responsible for "daily" conditions in the pod and who was physically present in the unsanitary cells such that he personally observed the conditions.  And in any event, I am aware of no legal principle that exempts part-time employees from meeting their constitutional obligations.  Mr. Saunders's allegations are enough for a reasonable jury to infer that he had subjective knowledge of the risk of harm those conditions posed.  See Farmer, 511 U.S. at 842, 114 S. Ct. at 1981.

A jury could also find that Corporal Wright knowingly disregarded the substantial risk of harm for reasons beyond mere negligence.  We know that Corporal Wright knew of the filthy conditions in the acute pod cells and was charged with overseeing the housing unit, and yet the conditions remained virtually "the same," with no improvement in sanitary practices.  Mr. Saunders testified that when "inspectors or guests" would come through the acute pod, the officers would specially clean the cells and bring in "little plastic platforms" for inmates to sleep on "to get people off the concrete."  Then after the visitors left, the plastic

34

platforms were removed and the conditions in the pod would return to normal.

These striking allegations, never mentioned in the majority opinion, certainly

suggest that Corporal Wright knew it was a problem for inmates to be sleeping on

the filth of the cell floor, and knew of ways to keep that from happening.  At the

same time there is no evidence Corporal Wright undertook any of those

improvements on an ongoing basis.  See Farmer, 511 U.S. at 842, 114 S. Ct. at

1981 (subjective knowledge may be "demonstrate[ed] in the usual ways, including

inference from circumstantial evidence, and . . . from the very fact that the risk was

obvious" (citation omitted)).  Based on this evidence, Mr. Saunders has

"demonstrate[d] that, with knowledge of the infirm conditions,  [Corporal Wright]

knowingly or recklessly declined to take actions that would have improved the

conditions."  LaMarca v. Turner, 995 F.2d 1526, 1537 (11th Cir. 1993).  Mr.

Saunders has therefore satisfied the subjective element of his Eighth Amendment

claim against Corporal Wright.

### III.  FAILURE TO INTERVENE DURING SELF-HARM

A.  OBJECTIVE CONSTITUTIONAL VIOLATION

In addition to the jail's unsanitary conditions, Mr. Saunders has also stated a

claim that Corporal Wright violated his rights under the Eighth Amendment based

on the August 3, 2008 incident in which Mr. Saunders harmed himself.  Mr.

Saunders alleged that, on that day, Corporal Wright "ignored" his pleas to

35

"alleviate the serious conditions of the Bubble"— heat and overcrowding—that caused him to have a "panic attack and mental breakdown." According to Mr. Saunders, Corporal Wright then watched without intervening for five minutes while Mr. Saunders suffered a panic attack and "uncontrollably repeatedly bang[ed] his head against the steel door of the cell, resulting in a serious injury."

As I've said, in order to satisfy the objective prong of the Eighth Amendment analysis, Mr. Saunders must show he was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834, 114 S. Ct. at 1977. How can it be disputed that during the five minutes Mr. Saunders was banging his head against the steel door—with blood streaming down his face—he was under "a substantial risk of serious harm"? See id. But beyond that, a reasonable jury could also find Mr. Saunders was under a substantial risk of serious harm in the moments before he began violently engaging in self-harm. The record before us establishes that Mr. Saunders suffered from anxiety and panic attacks. Just four days before the August 3rd incident, he had a panic attack that caused him to repeatedly bang his head against the wall. And just one week before that first head-banging episode, Mr. Saunders attempted suicide by cutting his wrists.

Ultimately, on August 3, 2008 his cell in the acute pod was "severely overcrowded" with at least eight inmates in it, and with no air conditioning,

36

because it had "stopped working."  According to Mr. Saunders, this caused the cell

to be "real stuffy" and "stinking" because there was no "air getting in[to] the cell."

Compounding these problems were the underlying unsanitary conditions in the

acute pod I've described above.  Mr. Saunders told Corporal Wright these

conditions were exacerbating his claustrophobia and causing him to "hav[e]

problems breathing."  He further told Corporal Wright he needed "some air

flowing" so he "could recover."  In light of Mr. Saunders's serious mental illnesses

and multiple, recent instances of suicidal and self-injurious behavior, and his plea

for relief from the overcrowded and filthy conditions that existed that day, a

reasonable jury could find that the conditions in his cell on August 3rd created a

"substantial risk of serious harm" to Mr. Saunders's mental health.  Id.  Even if the

particular type of self-harming behavior (violent head-banging) was not

foreseeable,[3] the circumstances clearly created a substantial risk that his mental

condition would severely deteriorate.  That is sufficient to satisfy the Eighth

Amendment's objective prong.  See Thomas v. Bryant, 614 F.3d 1288, 1312 (11th

Cir. 2010)  ("[M]ental health needs are no less serious than physical needs for

purposes of the Eighth Amendment." (quotation omitted)); Waldrop v. Evans, 871

F.2d 1030, 1036 (11th Cir. 1989) ("[P]rison officials have an obligation to take

action or to inform competent authorities once the officials have knowledge of a

---

[3] Mr. Saunders had done it before, so I believe it was foreseeable.

37

prisoner's need for medical or psychiatric care. . . . [F]ailure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference.").

B.  DELIBERATE INDIFFERENCE TO THE VIOLATION

Corporal Wright's deliberate indifference during the August 3rd incident is clear.  Corporal Wright was in the overcrowded acute unit with Mr. Saunders in the moments before—and during—his panic attack.  Before his panic attack started, Mr. Saunders "explained" the situation to Corporal Wright, including that the "AC [was] not working" and that he was "claustrophobic [and] was having problems breathing."  He implored Corporal Wright to give him some sort of relief, asking if he could "move [the inmates] to . . . other cells," or "provide air in the cell, either put the bean flap down, put a fan in front of the door to get some air flowing in there."  Mr. Saunders even suggested that the officers put him "in the strap chair" if that would be necessary to take him out of the cell "for a while till [he] could recover."  Of course, beyond what Mr. Saunders told Corporal Wright, the corporal also knew that Mr. Saunders was acutely mentally ill.  After all, that was the reason he had been housed in the acute unit in the first place.  Corporal Wright was thus plainly aware of the risk Mr. Saunders faced from the conditions in his cell.  See Brooks, 800 F.3d at 1305 (concluding that prison officer was "plainly aware of the risk [the inmate] faced" because the inmate "alleged that he

38

repeatedly begged [the officer] to . . . remove" the condition causing the substantial risk of harm).

Mr. Saunders has also shown the remaining elements of deliberate indifference: namely, that Corporal Wright disregarded the risk of serious harm to Mr. Saunders by more than negligence. McElligott, 182 F.3d at 1255. Corporal Wright refused to take any action at all to alleviate Mr. Saunders's condition, even after Mr. Saunders himself suggested a variety of simple measures that could have helped. Corporal Wright then stood there with other officers watching and laughing for five minutes as Mr. Saunders "split [his] head open" from his self-harming behavior. This is textbook deliberate indifference. See Brooks, 800 F.3d at 1305 (concluding that prison officer who repeatedly "refused [the inmate's] requests to use the toilet" was deliberately indifferent because the officer "subjected [the inmate] to derision and ridicule while he was forced to repeatedly soil himself.").

## IV.  QUALIFIED IMMUNITY

In addition to establishing that Corporal Wright violated his rights under the Eighth Amendment, Mr. Saunders must also overcome Corporal Wright's assertion of qualified immunity. The defense of qualified immunity "completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'" Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002)).

In deciding whether an officer is entitled to qualified immunity, we conduct a two-part inquiry. First, we ask whether the defendant's "conduct violated a constitutional right." Id. at 1234 (quotation omitted). Second, we ask whether the violation was "clearly established" at the time of the alleged misconduct. Id. at 1233 (quotation omitted). A right is clearly established if it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). The "salient question" is whether the state of the law at the time of the alleged misconduct gave the defendants "fair warning" that their actions were unconstitutional. Hope, 536 U.S. at 741, 122 S. Ct. at 2516.

Having already determined that Corporal Wright's conduct violated the Eighth Amendment, I turn now to whether the Eighth Amendment right at issue was "clearly established."

A.  UNSANITARY CONDITIONS

Mr. Saunders has shown that his rights were clearly established with respect to the general lack of sanitation in the acute pod. In Baird, this Court addressed whether unsanitary conditions of confinement violated the Eighth Amendment, and

40

also considered whether the defendants were entitled to qualified immunity. 926 F.2d at 1063–66. The conditions at issue in Baird included: "a plastic-covered mattress without bedding; filth on the cell's floor and walls; deprivation of toilet paper for three days; deprivation of running water for two days; lack of soap, toothbrush, toothpaste, and linen; and the earlier occupancy of the cell by an inmate afflicted with an HIV virus." Id. at 1063. We concluded that these conditions did not meet "the minimal standards required by the Eighth Amendment." Id. at 1065. In denying qualified immunity to the prison officials, we held that "the right of a prisoner not to be confined in a cell . . . in conditions lacking basic sanitation" has been clearly established since 1986. Id. at 1065–66. Two decades earlier, in Novak, our predecessor court surveyed cases finding an Eighth Amendment violation based on conditions of confinement and concluded: "[T]here is a common thread that runs through all these cases . . . . That thread is the deprivation of basic elements of hygiene." See Novak, 453 F.2d at 665.

Under Baird and Novak, a reasonable officer in Corporal Wright's position would have known that the unsanitary conditions in the acute pod violated the Eighth Amendment. See Brooks, 800 F.3d at 1306–07 (holding that "Baird and Novak, together, would have provided fair and clear warning that [an inmate's] alleged treatment would violate the Eighth Amendment," where the inmate was "forced to sit in his own feces for an extended period of time"). It's true that

41

neither Baird nor Novak involved the precise circumstances at issue here. But "[e]xact factual identity with a previously decided case is not required." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc); see Hope, 536 U.S. at 741, 122 S. Ct. at 2516 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

Despite certain factual differences between the facts in Baird and Novak and the facts here, this precedent made clear that two specific aspects of the unsanitary conditions in the acute pod constituted unconstitutional conditions. Hope, 536 U.S. at 741, 122 S. Ct. at 2516. First, Novak noted that "proximity to human waste" often constitutes a "deprivation of basic elements of hygiene" in violation of the Eighth Amendment. Brooks, 800 F.3d at 1306 (quotation omitted). Mr. Saunders has shown that he was directly exposed to human waste and other bodily fluids for extended periods of time, including where he slept and ate. Second, this Court expressly held that conditions lacking "the provision of hygiene items[] violate[] the minimal standards required by the Eighth Amendment." Baird, 926 F.2d at 1066. The record here shows that the jail prohibited inmates in the acute pod from having many basic "hygiene items," including toothbrushes, toothpaste, eating utensils, clean sleeping mats, and most importantly hand soap. This closely matches the items that the inmates in Baird were deprived of: "soap, toothbrush, toothpaste, and [clean] linen[s]." 926 F.2d at 1063. In sum, Baird, Brooks, and

42

Novak gave Corporal Wright "fair warning" that the unsanitary conditions of the acute pod—particularly the combination of proximity to human waste and the lack of hand soap—violated Mr. Saunders's Eighth Amendment rights. Hope, 536 U.S. at 741, 122 S. Ct. at 2516. Because Corporal Wright's Eighth Amendment violation was clearly established, he is not entitled to qualified immunity.

B.  FAILURE TO INTERVENE DURING SELF-HARM

The core of the Eighth Amendment is the prohibition on conduct that "involve[s] the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976) (quotation omitted). According to Mr. Saunders's facts, Corporal Wright stood watching for five minutes as Mr. Saunders "uncontrollably" banged his head against the steel door of his cell. The head banging was so violent "there was blood on the door and he was bleeding down his face," and Mr. Saunders needed stitches to close his wounds. Allowing Mr. Saunders to injure himself like this without coming to his aid for five minutes is a stark example of the "unnecessary and wanton infliction of pain." See id. As this Court has held, "[t]he law [is] clear . . . that prison officials have an obligation to take action . . . once the officials have knowledge of a prisoner's need for medical or psychiatric care." Waldrop, 871 F.2d at 1036. Indeed, Corporal Wright and his deputies not only stood by but "laughed at [Mr. Saunders] while he was beating his head on the door." Laughing at a mentally ill inmate's violent self-harming

43

behavior is "an act of obvious cruelty" for which there is no qualified immunity. See Brooks, 800 F.3d at 1307 (quotation omitted) (denying qualified immunity to officer who was "[l]aughing at and ridiculing an inmate who [was] forced to sit in his own feces for an extended period of time"). The majority opinion distinguishes the facts of Brooks as "ghastly." Majority Op. 18. However, the gratuitous cruelty of laughing at suffering inmates is common to the allegations made by Mr. Brooks in his case and those made by Mr. Saunders here.

## V.  CONCLUSION

Mr. Saunders deserves an opportunity to present a jury with his claims that Corporal Wright subjected him to inhumane conditions of confinement. He has demonstrated two claims that should survive summary judgment, and I would affirm the District Court's denial of qualified immunity on those claims.[4]

The majority assures us that it "take[s] no particular pleasure," in the outcome of this case, Majority Op. 16, but we are judges, whose job demands application of the constitutional principles, not expressions about our feelings. And the majority opinion is mistaken when it declares "we have no other choice" but to foreclose this suit. Id. This court can recognize the flagrantly unconstitutional conditions of confinement, and in fact is obligated to do so. Instead, the majority opinion downplays the conditions Mr. Saunders faced,

---

[4] I concur with the holding of the majority on Mr. Saunders's remaining claims.

44

describing them as "troubling" and "unpleasant." Id. at 10, 16.  These adjectives do not accurately describe the gratuitous cruelty Mr. Saunders endured at the Brevard County Jail.  Our Constitution does not turn a blind eye to these types of conditions, and neither should we.

For these reasons, I dissent.