**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-11491

Non-Argument Calendar

_____

TOM SHULLAW,

*Plaintiff-Appellee,*

*versus*

GRANT MCMULLEN,

Escambia County Sheriff's Deputy in his individual capacity,

JONATHAN HILL,

Escambia County Sheriff's Deputy in his individual capacity,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:23-cv-13317-MCR-ZCB

_____

Before JORDAN, ROSENBAUM, and KIDD, Circuit Judges.

PER CURIAM:

Defendants Jonathan Hill and Grant McMullen appeal the district court's denial of qualified immunity at summary judgment in this 42 U.S.C. § 1983 civil-rights action brought by Plaintiff Tom Shullaw. Shullaw alleged that, on April 11, 2020, Escambia County Sheriff's Office Deputies Hill and McMullen violated his Fourth Amendment rights by detaining him in his home without a warrant, reasonable suspicion, or exigent circumstances; by using excessive force against him (or failing to intervene to stop it); by searching his home; and by continuing to detain him after any exigency had passed. The district court found that the Deputies were not entitled to qualified immunity because, construing the record in the light most favorable to Shullaw, no reasonable officer could have believed that their actions were lawful.

After careful review, we conclude that arguable exigent circumstances supported Shullaw's initial detention, the initial entry into his home, and the brief search inside. So we reverse the denial of qualified immunity as to those claims. The Deputies had been dispatched to Shullaw's home in relation to an open missing-persons case involving an 8-year-old girl, and Shullaw answered the door with a gun in his left hand after chambering a round, which created an audible "racking" noise that the Deputies heard outside. In these ambiguous circumstances, with potentially serious consequences, we cannot say it would have been apparent to any reasonable officer that it was unlawful to detain Shullaw pending further investigation.

But we affirm the district court's denial of qualified immunity as to Shullaw's claims for excessive force and for unreasonable seizure once any exigency had passed. The record supports findings that Shullaw had disarmed and was complying with the Deputies' commands when Deputy McMullen, with Deputy Hill looking on, used substantial and gratuitous force to handcuff Shullaw, resulting in permanent injury. Genuine issues of material fact also preclude summary judgment on Shullaw's claims that Deputy McMullen unlawfully searched his home without probable cause or exigent circumstances, and that the Deputies continued to detain Shullaw in his home without justification well after any exigency had passed. Accordingly, we affirm in part and reverse in part, and we remand for further proceedings consistent with this opinion.

## I.  Factual Background[1]

At 10:23 p.m., on April 11, 2020, Deputies Hill and McMullen were dispatched to conduct a "welfare check" on an 8-year-old child at a Pensacola residence, in reference to an open missing-person case in Missouri. A person named David Smith had requested a welfare check on his child at the residence. The Deputies did not otherwise know the nature of the missing-persons case. Shullaw

---

[1] Because this appeal stems from a motion for summary judgment, "we must view the facts in the light most favorable to [Shullaw], the non-movant." *Hardigree v. Lofton*, 992 F.3d 1216, 1227 (11th Cir. 2021). Our review is de novo. *Id.* at 1223.

lived at the residence with his wife, Barbara Shullaw, the child's grandmother. Elizabeth Sitler, Shullaw's stepdaughter and the child's aunt, was also present.

### A. Deputies' arrival and Shullaw's initial detention

The Deputies arrived at the home shortly after 10:30 p.m. and knocked on the front door, which was lit by a porch light. The Shullaws were asleep in the rear of the home and awoke to a "very loud bang," followed by a second loud bang soon after. Shullaw dressed and grabbed a .380 Ruger handgun from the drawer of his nightstand before leaving the bedroom. As he made his way slowly down the hallway, Shullaw heard a third bang, but nothing else. Shullaw yelled out, "Who's out there," several times, but no one responded, and he did not hear any voices. For their parts, the Deputies maintain that Hill loudly announced "Sheriff's Office" after knocking on the door.

It's undisputed that Shullaw chambered a round of ammunition as he approached the front door, creating an audible "racking" noise that Hill and McMullen heard from outside. Hill said, "Gun," and the Deputies stepped back for cover.

Meanwhile, Shullaw looked out through a peephole in the front door but did not see anyone. He opened the door inward with the gun in his left hand and peered out. Two figures stepped out of the darkness with guns drawn, but they did not announce themselves as sheriff's deputies. Once the figures stepped into the light, Shullaw saw their uniforms and realized they were law enforcement. The Deputies yelled for Shullaw to drop the gun, and

he complied, sliding it away from him inside the home.  The Deputies testified that Shullaw did not "immediately comply" by dropping the gun, but they confirmed he did not raise it or "do anything threatening with it," and that he "bec[ame] compliant" by putting the gun down.  Shullaw testified that he was already "dropping down to put the gun on the floor . . . when they started yelling, 'Put the gun down, put the gun down.'"

After he placed the gun down, Shullaw testified, the Deputies ordered him to "walk out of the house."  From his position about four or five feet back from the door, Shullaw began walking towards the officers.  The gun was about 10 feet away from him at that time.  As he reached the door frame, one deputy told him to "get on the ground," while the other deputy "kept saying walk outside."  At the same, one or both deputies yelled at Shullaw, "I will shoot you.  I will shoot you in the face.  I will kill you."  So Shullaw said he "just dropped down right there" in the doorway.  Shullaw got down on his knees and began putting his hands on the ground in front of him.  Both deputies confirmed that, after putting the gun down, Shullaw became compliant and did not do anything threatening.

B. *Deputy McMullen's use of force*

As Shullaw was on his way to the ground, on his hands and knees, Deputy McMullen ran up, leapt in the air, and came down hard on Shullaw's back with his knees.  Shullaw testified that McMullen was "over six foot" tall and "probably 280 pounds."  McMullen grabbed Shullaw, who was partially inside, pulled him

onto the concrete front porch, and got on his back again, causing Shullaw's chin to bounce off the concrete.

Deputy McMullen moved to position his knees on the center of Shullaw's back, pinning him down. Shullaw's body was prone, and his arms were out to the side. McMullen then grabbed Shullaw's right arm and twisted it up behind Shullaw "to where it was pointing in a way that it wasn't meant to," causing Shullaw "a lot of pain." While twisting Shullaw's arm, McMullen screamed repeatedly, "Who's in the house? Where's the girl?" As a result of being knocked down and having McMullen's weight on him, Shullaw was having trouble breathing, and said so. But McMullen told him to "shut the 'f' up." Throughout this time, Deputy Hill was off to the side, several feet away, with his gun drawn on Shullaw.

Deputy McMullen eventually grabbed Shullaw's left arm and handcuffed him behind his back. McMullen continued to yell the same questions, "Who's in the house? Where's the girl?" Then, Deputy Hill walked over and "dropped down with his knees into the back of [Shullaw's] knees," and McMullen said he was under arrest. Shullaw was placed in handcuffs at around 10:35 p.m., just three minutes after the Deputies arrived.

C. *Deputies' warrantless entry and search*

Barbara came to the front door while the Deputies were on top of Shullaw. Barbara identified herself and Shullaw and asked what was going on and how she could help. She was "very scared" but attempted to deescalate by talking low and slow. McMullen

got up off Shullaw and went to speak with Barbara, claiming they had received a report of an "abducted child." In response to McMullen's questions, Barbara explained that she was the child's grandmother, that her daughter was the child's mother and the complainant's ex-wife, that the complainant was incarcerated, and that her daughter had full custody. It's undisputed that McMullen entered the home without consent to speak with Barbara. While speaking with McMullen, Barbara observed that Shullaw's face was white and the right side of his body was shaking, and she feared he may have had a stroke.

After speaking with Barbara, Deputy McMullen testified, it became "pretty apparent that there's not going to be a missing child at this address" and that "Shullaw has not committed a crime." McMullen gathered that the "issue that we had been called down there for was custody related, not missing child/kidnapping related." Both Barbara and Shullaw reported hearing McMullen say, "Oh, shit," before instructing Deputy Hill to uncuff Shullaw. Deputy Hill took off the handcuffs, removed his knees from Shullaw's legs, and helped him stand. Shullaw was in handcuffs for approximately five minutes total. The Deputies indicated that Shullaw, upon his release from handcuffs, was no longer suspected of criminal activity or viewed as a threat.

Barbara observed that Shullaw's "right shoulder and arm slumped down" and they were vibrating or shaking. Shullaw was also very unstable on his feet, so Deputies permitted Shullaw's stepdaughter to help him into a chair in the hallway.

Before Shullaw was brought inside, Deputy McMullen picked up the gun, unloaded it, and placed it on a shelf. Deputy Hill ran the serial number on the gun in the hallway, while McMullen walked into the master bedroom and around the bed, before returning to the living room when confronted by Barbara. During this time, Shullaw heard drawers being opened in what sounded to him like the bathroom. When McMullen came back, Hill reported that the gun was clean. The Deputies looked at each other and said, "Oh, shit."

### D. Shullaw's continuing detention

Because Shullaw claimed to be injured by law enforcement during the encounter, Deputy McMullen determined that the incident qualified for a "Blue Team Use of Force Report." He notified his supervisor, Sergeant Curtis Cephas, at around 10:38 p.m., to investigate and prepare a "report on the validity of our actions." McMullen also called EMS to the scene at around 10:51 p.m. And he contacted Escambia County Crime Scene to document Shullaw's injuries.

Thus, according to Deputy McMullen, the Deputies' presence at Shullaw's home had "transitioned from a criminal investigation to rendering assistance." The Deputies remained at the home until 11:32 p.m., after Cephas, EMS, and Crime Scene had left the scene.

Nothing in the record suggests that Shullaw consented to the Deputies' "assistance," however. Just the opposite. Shullaw

testified that throughout that "whole time [he] was asking the deputies to leave, and they kept saying no." In addition, according to Barbara, the Deputies refused to permit her to access or use her cell phone or put on additional clothes, and they directed her and the other occupants "to stay together," limiting their movement inside the home.

Before EMS arrived, Shullaw had informed Deputy McMullen that he did not want any medical treatment and that he would get his own. Still, Shullaw spoke briefly with one of the EMS personnel and said he had a radiating pain from the shoulder to the elbow. She said he was fine and that "[t]his is why you shouldn't rack a gun," echoing McMullen's comments to her upon EMS's arrival. Shullaw was not examined at the scene, and he declined transportation to the hospital, given the recent outbreak of COVID-19.

Britney Bishop with Crime Scene arrived after EMS and took photographs of Shullaw's injuries. Deputy McMullen suggested that the Deputies needed to stick around to prevent Shullaw from running or attempting to make his injuries look worse. The Deputies remained inside or around the house until Bishop completed her work. Deputy Hill guarded the screen door exit from the back patio, where the occupants had moved to get Shullaw some air, while McMullen remained inside the house. Barbara testified that the family was "held on the back porch" until Bishop finished photographing Shullaw's injuries.

Once Bishop left, McMullen spoke on the phone for several minutes, and he then tried to engage Shullaw in a "back and forth like he was trying to be my best friend," asking about Shullaw's Navy career, work, and hobbies. Eventually, McMullen said, "Well, we're gonna go ahead and get out of your hair now," and left with Deputy Hill just after 11:30 p.m. Shullaw was not charged with any crime.

### E. Shullaw's injuries

Shullaw asserts that, as a result of this incident, he experienced a rotator-cuff tear and low-back injury, both of which required surgery. Both Deputies claim that Shullaw told them he had a pre-existing injury to his right elbow or shoulder, which Cephas repeated in his use-of-force report. Nothing of the sort appears in Shullaw's testimony, though, and he denied telling Cephas he had a preexisting arm injury. While Barbara informed the Deputies that Shullaw had a prior back injury, for which he previously had surgery, there is no indication she referenced a prior arm injury, either.

## II. Procedural History

In June 2023, Shullaw sued Deputies Hill and McMullen under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment rights against unreasonable searches, seizures, and uses of force. Shullaw amended his complaint in July 2023, and the Deputies moved to dismiss. Denying the motion in substantial part, the court found that Shullaw had plausibly alleged that Hill and McMullen violated his Fourth Amendment rights by entering his

home without a warrant to conduct a detention, arrest, and search (Counts 2, 3, and 5–8), that McMullen used excessive force in detaining Shullaw (Count 1), and that Hill failed to intervene to stop McMullen's use of excessive force (Count 4). The court dismissed as duplicative two over-detention claims (Counts 7 and 8).

Following discovery, Deputies Hill and McMullen filed a motion for summary judgment, raising the defense of qualified immunity. Shullaw responded in opposition, and the district court denied the motion in full.

The district court first rejected Shullaw's argument that the encounter itself was unreasonable. Noting that it was "not terribly late" at night, the Deputies had just been dispatched, and the porch light was on, the court reasoned that the Deputies were permitted to enter on to the property for a "knock and talk" to check on the potential welfare of the minor child.

Turning to the Deputies' actions once at Shullaw's home, the district court reasoned that the voluntary knock and talk escalated to a *Terry*[2] stop when the Deputies drew their weapons and directed Shullaw's movements. At that time, according to the court, the evidence reflected that the Deputies had at least arguable reasonable suspicion that they might be in danger and that Shullaw might be involved in criminal activity, given the call from an identified person about an out-of-state missing child at the address and the racking of a gun behind the door. Thus, the court concluded

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

that the Deputies had "reasonable safety concerns to necessitate arming themselves and immediately commanding Shullaw to disarm once he opened the door with a gun."

Nonetheless, the district court determined that the "safety calculus necessarily changed after Shullaw complied and placed his gun on the ground." The court noted that the evidence, construed in Shullaw's favor, showed that he complied with the officer's commands by dropping the weapon, sliding it away, moving toward the threshold of the home, and getting down on his hands and knees. The Deputies also had not identified any other conduct that presented a safety threat, and the complainant's request for a welfare check for his missing child did not provide even arguable suspicion of criminal activity, according to the court. Because Shullaw was compliant and any threat had been defused, the court reasoned, no objectively reasonable officer could have believed that it was lawful to forcefully pin down and handcuff him to ensure the safety of the officers or others. The court also found that there was a genuine issue of material fact about the location of the seizure, whether inside or outside the home, and that exigent circumstances were lacking.

As to the entry and search of the home, the district court concluded that no reasonable officer could have determined that there were exigent circumstances to believe a person was in danger at the time. The court observed that Shullaw was no longer suspected of criminal activity by the time Deputy McMullen conducted an investigation inside the home, and that the dispatcher's

report did not say anything about a suspected kidnapping or other criminal threat to the child.

Finally, the district court found that qualified immunity was not warranted as to the excessive-force and failure-to-intervene claims. The court agreed with Shullaw that the force was excessive because the evidence, construed in his favor, showed there was no need to apply force at all. And because Hill was present when that force was used, he "may be liable for failing to intervene." Accordingly, the district court denied qualified immunity to Deputies Hill and McMullen. They now appeal.

### III. Discussion

Qualified immunity protects government employees from individual liability for discretionary conduct unless they violate clearly established law of which a reasonable person would have known. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). The qualified-immunity inquiry "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quotation marks omitted).

Officials invoking qualified immunity must show first that they were acting within the scope of their discretionary authority. *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019). There is no dispute that Deputies Hill and McMullen were engaged in discretionary duties on the night of April 11, 2020. Accordingly, Shullaw has the burden to show that qualified immunity does not apply. *See id.*

To meet this burden, the plaintiff must establish that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Miller v. Palm Beach Cnty. Sheriff's Office*, 129 F.4th 1329, 1333 (11th Cir. 2025). Whether qualified immunity applies must be decided "on a claim-by-claim and defendant-by-defendant basis." *Id.* "The salient question for our clearly established analysis is whether the state of the law at the time the officers acted gave them fair warning that their conduct was unconstitutional." *Bates v. Harvey*, 518 F.3d 1233, 1248 (11th Cir. 2008) (quotation marks omitted).

### A. The Deputies' initial detention of Shullaw

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). At the Amendment's "very core" is the right of an individual "to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." *Id.* (quotation marks omitted).

Given the special protection afforded the home, searches and seizures within a home and without a warrant are presumptively unreasonable. *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015); *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1327 (11th Cir. 2006). This general rule is "subject only to a few jealously and carefully drawn exceptions." *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007) (quotation marks omitted). The Deputies rely on the exception for exigent circumstances, including to render aid.

In the absence of consent, an officer may not enter a home to conduct a warrantless arrest or investigatory detention without

at least reasonable suspicion *and* exigent circumstances. *Moore v. Pederson*, 806 F.3d 1036, 1045 (11th Cir. 2015). The Deputies do not suggest that they obtained consent to enter the Shullaws' home.

Exigent circumstances "arise when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *Feliciano v. City of Miami*, 707 F.3d 1244, 1251 (11th Cir. 2013) (quotation marks omitted). Urgent action may be necessary where there is a "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).

If officers enter a home to render assistance, they must have an "objectively reasonable belief that someone inside is seriously injured or threatened with such injury, and is in need of immediate aid." *United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013) (quotation marks omitted); *see Case v. Montana*, 607 U.S. \_\_, 146 S. Ct. 500, 507 (2026) (explaining that the standard is whether the officers had an "objectively reasonable basis for believing that their intervention was needed to prevent serious harm"). But an "emergency-aid entry provides no basis to search the premises beyond what is reasonably needed to deal with the emergency while maintaining the officers' safety." *Case*, 146 S. Ct. at 507. "[W]e evaluate each case of alleged exigency based on its own facts and circumstances." *Missouri v. McNeely*, 569 U.S. 141, 150 (2013) (quotation marks omitted).

The Deputies maintain that Shullaw was reasonably detained for investigatory reasons and officer safety because, when they went to investigate a report of a missing child from out of state, he answered the door with a loaded gun in his hand, which he had audibly chambered moments earlier, failed to initially comply with the Deputies' lawful commands, and remained in range of the loose gun.

We assume without deciding that Deputies Hill and McMullen violated Shullaw's Fourth Amendment rights by detaining him in his home without exigent circumstances. *See Moore*, 806 F.3d at 1045. Nonetheless, we cannot say that this conduct violates clearly established law. "We have emphasized that fair and clear notice to government officials is the cornerstone of qualified immunity." *Id.* at 1052 (quotation marks omitted). Our cases do not provide such notice in this case.

Shullaw does not dispute that the Deputies "had a reasonable basis to order [him] to get down on the ground and slide his gun away at the outset of the encounter." What's more, given that the encounter involved a potential missing child from out of state, Shullaw's initial apparent hostility to the Deputies—though eminently reasonable from his own perspective—arguably supported a reasonable belief that Shullaw may have been harboring the child, even if the Deputies had no grounds for that belief upon arriving at the residence. *See Holloway*, 290 F.3d at 1339 (stating that conduct must be "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of

sometimes ambiguous information concerning potentially serious consequences").

Thus, even in the light most favorable to Shullaw, the record shows some arguable grounds for exigency, given the loose firearm inside the home and the potential presence of a missing 8-year-old. And "arguable" grounds for action are usually enough when it comes to qualified immunity. *See, e.g.*, *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop.").

Shullaw has not identified any precedent that would have put the Deputies on notice that the undisputed circumstances did not authorize a limited warrantless entry to detain Shullaw for officer safety pending further investigation. *See Sebastian*, 918 F.3d at 1307. Shullaw relies on *Moore*, where we held than an officer's warrantless entry lacked exigent circumstances because, upon arriving to investigate a neighbor's complaint about loud "verbal" arguments, there was no evidence of any violence in the apartment or reason to suspect that the occupants were in danger. *See* 806 F.3d at 1045. *Moore* does not provide clear notice that exigent circumstances were lacking here, though, given the presence of the recently "racked" gun, Shullaw's failure to immediately comply, and a reported missing minor victim—circumstances that did not exist in *Moore*.

Shullaw also cites case law for the proposition that the mere fact that a homeowner is armed and uncooperative does not provide exigent circumstances, *see O'Kelley v. Craig*, 781 F. App'x 888, 896–97 (11th Cir. 2019), and that a disarmed individual is "no different than any other unarmed individual," *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016). *O'Kelley* is not published, of course, so it cannot clearly establish a right. It also did not involve any potential victim, while *Perez* was about excessive force, not exigent circumstances. In any case, under the specific circumstances facing the Deputies, we disagree that any arguable exigency evaporated entirely once Shullaw dropped the gun, for the reasons we have already explained.

We hold that Shullaw has not shown that his detention, even if inside the home and in violation of his Fourth Amendment rights, violated clearly established law. We therefore reverse the denial of qualified immunity as to this claim.

B. *Deputy McMullen's use of excessive force*

Although we conclude that qualified immunity protects Deputies Hill and McMullen as to Shullaw's initial detention, the record, construed in Shullaw's favor, supports a reasonable finding that McMullen violated clearly established law by using constitutionally excessive force to effectuate that detention.

We have repeatedly held that the "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). Our case law is also "clear that serious and substantial injuries

caused during a suspect's arrest when a suspect is neither resisting an officer's commands nor posing a risk of flight may substantiate an excessive force claim." *Sebastian*, 918 F.3d at 1311. Thus, "if an arrestee demonstrates compliance, but the officer nonetheless inflicts gratuitous and substantial injury using ordinary arrest tactics, then the officer may have used excessive force." *Id.* That's true even when the plaintiff "was initially recalcitrant and even acted aggressively toward the officer." *Id.*

In *Smith v. Maddox*, for example, an officer approached Smith because he matched the description a tipster provided. 127 F.3d 1416, 1417 (11th Cir. 1997). As the officer neared Smith, Smith raised a baseball bat in a threatening way and then dropped the bat and fled. *Id.* at 1418. A short chase ensued, but Smith "docilely submitted to arrest" when an officer ordered him to "get down." *Id.* Once Smith was on the ground, the officer put his knee into Smith's back, pulled Smith's arm behind his back to apply handcuffs, "and then with a grunt and a blow . . . [the officer] broke Smith's arm." *Id.* We held that the officer was not entitled to qualified immunity because the "broken arm was obviously unnecessary to restrain" Smith when he "was offering no resistance at all." *Id.* at 1420. We reasoned that "even a previously fractious arrestee" did not justify "the considerable effort and force inferable from the [officer's] grunt" because Smith was "docile" at the time. *Id.* In short, *Smith* "removed any doubt that an officer's use of substantial force on an arrestee who, although not yet restrained, had ceased any resistance or threatening behavior, is excessive." *Glasscox v. City of Argo*, 903 F.3d 1207, 1219 (11th Cir. 2018).

When viewed in the light most favorable to Shullaw, the record shows that it would have been "obviously clear to any reasonable officer that the display of force was excessive." *Id.* The record supports reasonable findings that Deputy McMullen used substantial force on a detainee who, while not yet restrained, "had ceased any resistance or threatening behavior." *Id.* At the time force was used, Shullaw, despite being "initially recalcitrant," had disarmed, slid the gun away, and started getting to the ground. Both Deputies testified that Shullaw was "compliant" at the time he was handcuffed. The mere fact that Shullaw's gun remained unsecured during this time does not suggest that more than *de minimis* force was necessary to effectuate Shullaw's detention.

The Deputies maintain that any force used was *de minimis* and incident to lawful detention, but they fail to meaningfully engage with the evidence here. Our case law is clear that excessive force can include the "inflict[ion] of gratuitous and substantial injury using ordinary arrest tactics," *Sebastian*, 918 F.3d at 1311, and that we must "consider the manner in which [the officer] executed" the tactic, *see Patel v. City of Madison*, 959 F.3d 1330, 1342 (11th Cir. 2020). In *Patel*, for example, we concluded that "the seriousness and permanence of [the plaintiff's] injuries and the unusual alacrity and horsepower of [the officer's] leg sweep preclude [the] force from being characterized as *de minimis*." *Id.* at 1342. Similar reasoning applies here. *See also*, *Saunders v. Duke*, 766 F.3d 1262 (11th Cir. 2014) (explaining that in the Fourth Amendment context, as in the Eighth Amendment context, a person who is gratuitously beaten "'does not lose his ability to pursue an excessive force claim

merely because he has the good fortune to escape without serious injury.'") (citation omitted).

A reasonable jury could find that Deputy McMullen, a large man, forcefully jumped on Shullaw's back, knocking him flat to the ground, and then grabbed and twisted Shullaw's right arm up his back past its range of motion, before finally grabbing his left arm and handcuffing him. The evidence also reflects that, among other injuries, Shullaw suffered severe and permanent injuries to his right arm, including a torn rotator cuff, as a result of McMullen's use of force. Accepting Shullaw's testimony as true, as we must at this stage, it would have been obvious to any reasonable officer that it was unlawful to inflict such gratuitous and substantial injury on an unresisting detainee.

Finally, while Deputy Hill requests qualified immunity on the failure-to-intervene claim, his sole argument is that it fails for the same reasons as the excessive-force claim. Because we conclude that qualified immunity does not shield the excessive-force claim, we likewise affirm the denial of qualified immunity on the failure-to-intervene claim.

C. *The Deputies' entry and search of the home*

For similar reasons we discussed regarding Shullaw's initial detention, we conclude it was not clearly established that the Deputies' entry into the home violated the Fourth Amendment. There were some arguable grounds for exigency at the outset, given the racking of the gun and Shullaw's initial recalcitrance, the presence of the loose gun, and the potential presence of a missing 8-year-old

and other occupants.  These same circumstances arguably justified a cursory search of the home to confirm the absence of the allegedly missing child.

Nonetheless, genuine issues of material fact remain as to the scope of Deputy McMullen's search.  Shullaw testified that he heard McMullen opening and closing drawers in what sounded like the bathroom, which McMullen denies.  Nothing in the record suggests that a child could be secreted within any of the bathroom drawers. *Cf. United States v. Cooks*, 920 F.3d 735, 736 (11th Cir. 2019) (upholding an emergency aid search of places that could harbor a child).  Plus, the record indicates that McMullen conducted the search after Shullaw was released and after it was apparent to McMullen that no child was present or in danger—that is, after the alleged exigency had passed.

If the jury found that Deputy McMullen rummaged through Shullaw's drawers without a warrant, probable cause, or any reason to think a child was there, that conduct would violate clearly established law.  *See id.* (stating that an exigency search for endangered persons must be "strictly circumscribed by the nature of the exigency that authorized it and limited to the areas where a person reasonably could be found") (quotation marks omitted); *see also Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995) (holding that it was "clearly established law that, absent probable cause and exigent circumstances, a warrantless search of a residence violates the Fourth Amendment").  Notably, the Deputies offer no defense to any opening of drawers during the search.  Accordingly, the district

court properly denied qualified immunity to Deputy McMullen on the claim for unreasonable search. Still, Deputy Hill was not implicated in this conduct, so he is entitled to qualified immunity for the allegedly illegal search. *See Miller*, 129 F.4th at 1333.

### D. Shullaw's continuing, unreasonable detention

Genuine issues of material fact also remain as to whether Shullaw's continuing detention was reasonable. "In evaluating the reasonableness of an investigatory stop, we must examine whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (quotation marks omitted). Relevant factors include the law enforcement purposes served by the detention, whether the officers diligently pursued means of investigation likely to confirm or dispel their suspicions, and the scope, intrusiveness, and length of the detention. *Id.*

A reasonable jury could find that the Deputies had dispelled their suspicions well before they stopped detaining Shullaw. The record shows that he was released from handcuffs within ten minutes of the Deputies' arrival, and that he was not otherwise physically restrained. The jury could infer that, in releasing Shullaw, the Deputies no longer believed Shullaw posed any threat or was suspected of criminal activity. Both Deputies testified as much, with McMullen explaining that, after briefly questioning Barbara, it became "pretty apparent" to him that there was not "a missing child at this address" and that "Shullaw ha[d] not commit-

ted a crime." And because McMullen called his supervisor to conduct an on-scene use-of-force review at 10:38 p.m., the jury could infer that the Deputies had completed their initial investigation by that time.

Thus, the evidence supports an inference that, despite recognizing that Shullaw posed no further threat and was not suspected of any crime, Deputies Hill and McMullen continued to detain Shullaw inside his home for more than 50 minutes, until 11:32 p.m. While at their home, according to Barbara and Shullaw, the Deputies restricted the occupants' movements, prevented use of cell phones, and refused multiple requests to leave. In other words, the occupants were not free to terminate the encounter, and so remained seized. *See United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (explaining that a "seizure" occurs if the citizen's cooperation is induced by "coercive means" or if a reasonable person would not "feel free to terminate the encounter").

Nor do the Deputies attempt to justify the entirety of their time in the Shullaws' home by their initial missing-child investigation—"the circumstances which justified the interference in the first place." *Gil*, 204 F.3d at 1351. In fact, the Deputies admit that they "stay[ed] with Shullaw *after the exigency*" (emphasis added), "wait[ing]" with him until EMS arrived and until "investigation could be completed by the Escambia County Sheriff's Office regarding the alleged use of force." They do not identify any authority to detain him for this purpose, though, instead of reasons related to officer safety, emergency aid, or criminal activity. They

also do not appear to dispute that Shullaw was detained until they left the premises. Thus, the record reveals a complete absence of justification or exigent circumstances to support a substantial part of Shullaw's detention.

Deputies Hill and McMullen had fair warning that it was unlawful to detain a person in his home without a warrant, exigent circumstances, or consent. *See Moore*, 806 F.3d at 1045. It was also clearly established that a seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Gil*, 204 F.3d at 1351. Because the record supports findings that Shullaw was detained well after the initial investigation had concluded, without any independent justification, it would have been apparent to any reasonable officer in the same circumstances that Shullaw's continued detention was unlawful. *See Bates v. Harvey*, 518 F.3d 1233, 1248 (11th Cir. 2008) ("[T]o avoid having her suit barred by qualified immunity, a plaintiff need only show that in the light of pre-existing law the unlawfulness [was] apparent.") (quotation marks omitted).

## IV. Conclusion

In sum, we affirm the district court's denial of qualified immunity as to Shullaw's § 1983 claims for excessive force, failure to intervene, unreasonable search (against Deputy McMullen), and unreasonable seizure, covering Counts 1, 4, and part of Counts 5–6. We reverse the denial of qualified immunity as to Shullaw's claims for false arrest, unlawful entry, and unreasonable search

26                    Opinion of the Court                    25-11491

(against Deputy Hill), covering Counts 2, 3, and part of Counts 5–6.  We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**